United States District Court
Southern District of Texas
FILED

FEB 1 8 2005

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PAULA REYNOLDS | * | |
| *Plaintiff* | * | |
| VS. | * | CIVIL ACTION NO.  B-03-056 |
| | * | |
| THE CITY OF LOS FRESNOS, TEXAS, | * | (JURY REQUESTED) |
| TOM ANDREWS, MANUEL ABREGO, | * | |
| JUAN C. SIERRA, IDA GARCIA, | * | |
| MIGUEL MENDOZA, RAY GARCIA, | * | |
| GONZALO ACEVEDO, AND PAM | * | |
| DENNY INDIVIDUALLY AND IN | * | |
| THEIR OFFICIAL CAPACITIES | * | |
| *Defendants* | * | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS'
## MOTION AND SUPPLEMENTAL MOTION FOR
## SUMMARY JUDGMENT

**TO THE HONORABLE UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Paula Reynolds opposes Defendants' Motion and Supplemental Motion

for Summary Judgment and in support thereof would show the Court as follows:

### I.     Factual Background

Plaintiff Paula Reynolds (hereinafter "Plaintiff" or "Reynolds") was employed

with the City of Los Fresnos (the "City") in various capacities beginning on October 17,

1997.   Plaintiff was terminated on February 7, 2002, by the City's Interim City

Administrator, Ida Garcia.[1]  At the time of her termination, Plaintiff was employed as the

City's Administrative Assistant.

---

[1]      There is some confusion among the Defendants regarding who terminated Reynolds and who was
present.  Garcia claims to have terminated Reynolds without consulting anyone.  Abrego claims Garcia
consulted him and he counseled against terminating Reynolds.  Andrews claims he alone terminated
Reynolds.  As for a reason, Abrego claims Reynolds was a good employee, Garcia claims several reasons

During her tenure with the City, Reynolds had occasions to report violations of law by her supervisor and to refuse to follow orders to violate state law herself. As a result, the City and her supervisors terminated her employment.

Reynolds was reviewing the City's credit card statements when she discovered a purchase was made on November 13, 2000, in the amount of $405.00 using the City of Los Fresnos' Wells Fargo Visa card. The charge was made by a company called Valentine Research. *See* Ex. A at ¶2. Plaintiff was not familiar with the company listed on the statement and was unable to track the purchase to a receipt. When Plaintiff called the number listed on the credit card statement, she was informed that the charge was made via the internet for a radar detector. *See* Ex. B, Reynolds Depo. at 14:22-15:15.

Plaintiff reported the credit card purchase to the Interim Police Chief, Adrian Cabrera. Denny, the City Secretary, was present when Plaintiff reported the incident to Chief Cabrera, and Denny admitted using the City's credit card to purchase the radar detector for a family member. *See id.* at 15:18-25. In addition to Chief Cabrera, Plaintiff reported the wrongful use of the City's credit card to the City's mayor, Manual Abrego. *See id.* at 20:3-4; *see also* Ex. A at ¶2. Defendant's Supplemental Motion for Summary Judgment attempts to portray Plaintiff's report as "nothing more than a question, and not a report of a violation of law." (Section III, B, Paragraph V). However, the summary judgment evidence proves the City originally took the report much more seriously.

Allegations of Denny's incompetence, corruption and misconduct or malfeasance in office were heard in a Special City Council Meeting on January 30, 2000. *See* Ex. C. City Attorney David Girault read the list of charges against Denny. *See id.* at 2066-68.

---

for terminating Reynolds, but those reasons either are after-the-fact justifications or based on rumors she never bothered to investigate; and Andrews did not have a reason for terminating Reynolds.

Among the charges was Denny's unauthorized use of the city credit card for the purchase of personal items. Girault described Denny's use of the credit card as a, "highly irresponsible, inexcusable, **criminal action**, which constitutes **theft** and misappropriation of entrusted public funds." *See id.* at 2066 (emphasis added). The City Council voted to place Denny on two months of probation and suspended her employment for two weeks without pay. *See id.* at 2074. Following Plaintiff's report of Denny's violation of law, Plaintiff was subjected to a pattern of illegal and discriminatory treatment and ultimately terminated from the City. *See* Ex. A at ¶5.

Yet another instance of following the law landed Reynolds in trouble with the City and her supervisors. The HOME Program is a low income housing program administered by the United States Department of Housing and Urban Development (HUD) and the Texas Department of Housing and Community Affairs (TDHCA). TDHCA awards contracts through an application process for specific amounts to municipalities and other housing related agencies around the state to administer program activities. The City qualified for and received HOME Program funds.

A portion of those funds was used to build homes and a portion was used to cover administrative costs such as salaries and other payroll costs. It was later discovered that the City had charged the HOME Program for houses that were not built and for houses that were built for relatives of City employees or who did not qualify. *See, e.g.,* Ex. D. The City also withdrew administrative funds from the HOME Program without providing the necessary accounting records, specifically timesheets, to justify the withdrawal as required by the TDHCA. *See id.*

In an attempt to remedy the missing timesheet problem and to avoid the City having to pay the TDHCA back the disallowed costs, Defendants asked Plaintiff to "find" timesheets during an Executive Session of the City Council. *See* Reynolds Depo. at 44:16-24. Plaintiff informed Defendants that she was the only one who kept the required timesheets and that there were no other timesheets to be found. *See id.* at 45:1-7. On March 18, 2002, Denny sent a letter to Alma Villarreal admitting that she did not keep timesheets for the HOME Program. *See* Ex. E (stating Denny, Chavez and others did not keep timesheets). Defendants continued to insist that Plaintiff find the non-existent timesheets. Plaintiff testified that she interpreted this request to mean Defendants wanted her to falsify the documents. *See* Reynolds Depo. at 45:12-18. Plaintiff refused to falsify or "recreate" the documents.

Defendant Tom Andrews testified during his deposition that he asked Plaintiff to recreate the documents and files. *See* Ex. F, Andrews Depo. at 45:19-46:5. Andrews also testified that he did not know whether the TDHCA was willing to accept recreated timesheets, nor did he verify that this would be acceptable. *See id.* at 59:14-17.

In February 2001, Mayor Manuel Abrego signed a Consolidated Administrative Time Sheet for June 2000 to November 2000 for Paul Chavez, Denny, Ruth Hernandez and Paula Reynolds. *See* Ex. G. Despite the fact that Plaintiff was the only employee who kept records of her time for the HOME Program, Abrego certified that the times, dates, and amounts on the submitted time records were correct and to the best of his knowledge. In his deposition testimony, Abrego agreed that falsifying the timesheets would be an illegal activity. *See* Ex. H, Abrego Depo. at 54:3-5. He also testified that it was critical for the City to "find" or "re-create" these documents because "the State could

come in her and shut the city down and they would literally run the city." *See id.* at 48:6-7.

On February 7, 2002, within hours of Plaintiff informing Defendant Tom Andrews that she was unable to provide any timesheets other than her own, Plaintiff was fired by the City of Los Fresnos. *See* Ex. A at ¶8.

After terminating Reynolds, the City scrambled to justify their actions. Defendant's Supplemental Motion for Summary Judgment states that Cortez terminated Plaintiff "after concerns grew about Plaintiff's competence and improprieties." (Section II, Paragraph IV). Those issues were never brought to Reynolds' attention before her termination. *See* Ex. A at ¶9. Those issues are not in her personnel file before her termination. Mayor Abrego disagrees with Garcia, stating in his deposition: "Overall, [Reynolds] was a good employee." *See* Abrego Depo. at 61:20 – 24.

Abrego believes Reynolds was unfairly terminated because she was not given a reason for her termination, the claimed reason for Reynolds' termination was never verified, and Reynolds was not given an opportunity to defend herself or correct any perceived problems (a process afforded even to employees who stole public funds). *See* Abrego Depo. at 56:21-57:23.

Garcia also testified that she decided to terminate Plaintiff because of an "accumulation of previous incidents and [the City's] financial standing." *See* Ex. I, Garcia Depo. at 66:20-67:4. However, Garcia testified that she was unaware of Plaintiff's actual salary. *See id.* at 67:5-6. Garcia also testified that she first started thinking of terminating Plaintiff on the day she terminated Plaintiff. *See id.* at 67:17-19. Garcia testified that she did not seek input from anybody before making her decision. *See*

*id.* at 66:15-19.  However, Abrego testified that Garcia discussed with him the reason for Plaintiff's termination on the previous day.  *See* Abrego Depo. at 55:1-56:1.  He testified that he told Garcia not to terminate Reynolds until she investigated the facts.  *See id.* at 55:15-19.

Garcia testified that she was informed by Assistant City Secretary Yolanda Perez that Plaintiff had attempted to falsify her payroll hours in order to receive money Plaintiff was not entitled to receive due to a suspension in pay.  Garcia testified that Perez informed her of this on the date of Plaintiff's termination.  Despite Abrego's admonishment to verify any stories before terminating Reynolds, Garcia did nothing to verify the truthfulness of this allegation.  *See* Garcia Depo. at 68:3-70:3  Garcia did not investigate the facts – she felt it was not important to confirm stories about Reynolds because "I made my decision."  *See* Garcia Depo. at 70:4-7.  It was a fait accompli.

The summary judgment evidence documents that Plaintiff did not falsify her payroll hours.  After a one day suspension without pay, Plaintiff deducted eight hours from her time sheet before submitting it to the City's payroll company.  Plaintiff then asked for, and was given permission to inform the payroll company to pay her for a full eighty-hour work week with the understanding that Plaintiff would deduct the eight hours during the following pay period.  *See* Garcia Depo. at 68:17-69:1; *see also* Ex. A ¶¶11-13.  She did that; however, the payroll company paid her for a full eighty hours despite marking on the pay stub that payment should have been for seventy two hours.  The payroll company made an error.  Reynolds did not contact the payroll company and instruct them to pay her full wage on the second check.  *See* Ex. A at ¶13.

On the other hand, Reynolds testified and produced evidence corroborating her testimony that she was terminated for reporting Denny's unauthorized use of a City credit card for personal purchases or her refusal to commit an illegal act, namely falsifying government documents. *See, e.g.,* Reynolds Depo.; Ex. A.

## II.    The Summary Judgment Standard

Summary Judgment shall be granted if the record, taken as a whole, "together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

If the moving party meets its burden, the non-movant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Little,* 37 F.3d at 1071 (citing *Celotex,* 477 U.S. at 325). Likewise, the nonmovant must present more than a mere "scintilla" of evidence. *See Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1086 (5th Cir. 1994). The evidence must be viewed in the light most favorable to the nonmovant. *See Whelan v. Winchester Prod. Co.,* 319 F.3d 225, 228 (5th Cir. 2003). Factual controversies, if any exist, are resolved in favor of the nonmoving party. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

**III.    Plaintiff's Whistleblower Claim Must Be Decided By A Jury**

The Texas Whistleblower Act creates a cause of action for a public employee like Paula Reynolds who reports a violation of law in good faith to an appropriate law enforcement authority and is suspended, terminated, or suffers other adverse personnel action as a result of the report. *See* Tex. Govt. Code §554.002 (Vernon Supp. 2004).

To prevail at trial, Reynolds must establish that (1) **she believed** the conduct reported was a violation of the law and (2) **her belief was reasonable** in light of her training and experience. *Wichita County v. Hart*, 917 S.W.2d 779, 784-85 (Tex. 1996). Although an employee need not establish an actual violation of law, there must be some law prohibiting the complained of conduct to give rise to a claim under the Whistleblower Act. *Llanes v. Corpus Christi Independent School District*, 64 S.W.3d 638, 642 (Tex. App. – Corpus Christi 2001, pet. denied). The Whistleblower Act defines "law" to mean : (1) a state or federal statute, (2) an ordinance of a local governmental entity, or (3) a rule adopted under a statute or ordinance. *See* Tex. Govt. Code §554.001 (1) (Vernon Supp. 2004).

The statute does not expressly define a report; however, Texas courts have broadly defined a report in the Whistleblower context to include "**any disclosure** of information regarding a public servant's employer tending to directly or circumstantially prove the substance of a violation of criminal or civil law, the state or federal constitution, statutes, administrative rules or regulations." *Llanes*, 64 S.W.3d at 642.

**A.    Reynolds Made A Report to An Appropriate Law Enforcement Official**

Defendants' own summary judgment evidence shows that Reynolds reported Denny's illegal conduct to an appropriate law enforcement agency: Reynolds informed the interim chief of police about Denny's illegal billing of a personal item to her City credit card. Even the City cannot seriously contend that the chief of police is not an appropriate person to whom criminal activity should be reported. *See* Andrews Depo. at 94:1-11.

Instead, the City relies on inapposite case law interpreting what constitutes a report and a distorted view of the facts – arguing Reynolds reported to the wrongdoer, to the press and to her employer.

First, the City relies on the decisions in *Huffman v. Office of Personnel Mgmt.*, 263 F.3d 1341 (Fed. Cir. 2001), and *County of Bexar v. Steward*, 139 S.W.3d 354 (Tex. App. – San Antonio 2004), for the proposition that a disclosure of wrongdoing to the wrongdoer is insufficient to establish a Whistleblower Act claim. The City conveniently ignores the fact that Reynolds reported the illegal conduct to the interim chief of police.[2] Reynolds' report caused the City Council to investigate Denny's illegal conduct. That investigation would never have happened had Reynolds only reported the misconduct to Denny as Defendants argue; after all, someone other than Denny reported her illegal conduct to the City Council, and Paula Reynolds was the first person who knew about the illegal credit card charges and reported it.

Defendants cite cases holding that a press conference is not a report. Reynolds never held a press conference; therefore, these cases do not apply.

---

[2] The City also ignores that Reynolds reported the conduct to then-mayor Manuel Abrego, City Finance Director Ruth Hernandez, and then-councilwoman Ida Garcia. *See* Reynolds Depo. at 12:25-13:8. Moreover, at the City Council meeting held on January 30, 2001, to discuss allegations against and possible

Moreover, Defendants cannot avail themselves of cases holding that a complaint to an employer is not a report for purposes of the Whistleblower Act. Again, Reynolds made a report to the appropriate law enforcement authority – the interim police chief. There is no *credible* evidence that Reynolds' report to chief Cabrera was merely a casual conversation. Reynolds reported Denny's criminal activity to Cabrera in his capacity as the chief of police; she does not have a personal friendship with him, so the report was not in a casual conversation. *See* Ex. A at ¶2 and Ex. J at ¶2.[3]

Contrasting Cabrera and Reynolds' affidavits, Cabrera's merely states why he *thinks* Reynolds may have told him about Denny's conduct. His unsupported speculation about Reynolds' intentions is precisely the type of incredible "evidence" the summary judgment rules prohibit. At the very least, a genuine issue of material fact exists concerning the characterization of Reynolds' statement – Reynolds states it was as a "report" and Cabrera states it was an "inquiry."

Moreover, Cabrera's affidavit standing alone creates a genuine issue of fact regarding whether Reynolds made a report to him. On the one hand, he states that Plaintiff brought him a "billing question"; on the other hand, he states that he "simply informed the mayor of the situation, for his information so the City could decide how it wanted to handle this matter. It was handled administratively . . .." Cabrera Aff. at ¶¶ 4 and 8, Ex. C to Defendants' Supplemental Motion for Summary Judgment. The only conclusion that can be reached from Cabrera's affidavit is that he himself believed Reynolds' report was more than a simple billing question; otherwise, he would not have

---

termination of Denny, Denny herself admitted that two members of her office had complained to the City Council about her conduct. *See* Ex. C at 2070.

delivered Reynolds' report to the Mayor. This issue is one for the jury, not summary judgment.

It is equally clear that the jury should be presented with the question of whether Reynolds' report was "reasonable." The summary judgment evidence submitted by defendant clearly shows that even the City believed Denny's conduct to be criminal. According to Garcia, Denny's conduct was, in her opinion, "a highly irresponsible, inexcusable, **criminal** action which constitutes **theft** and **misappropriation of entrusted public funds**". Ex. K (emphasis added). David Gerault, the City's attorney from the law firm of Atlas and Hall, L.L.P., used exactly the same language in his letter to Denny.. *See* Ex. L. He also read those charges to the City Council. *See supra*. If the then-mayor pro-tem and the City's own attorney thought Denny's conduct was criminal, then surely Reynolds' report was reasonable as well. ,

Rather than support summary judgment in its favor, Defendants' own summary judgment evidence (in addition to Plaintiff's evidence) shows that a genuine issue for trial exists. As a result, defendant's motion should be denied.

**B.    Reynolds Reported Violations of Law**

Notwithstanding Defendants' arguments, Denny violated state law when she used the City credit card for personal purchases. The fact that she reimbursed the City after Reynolds reported her conduct is irrelevant. The use of a City credit card for personal purchases violated several state statutes, including Texas Penal Code § 39.02 (Vernon 2003) (criminalizing abuse of official capacity) and Texas Penal Code § 31.03 (Vernon 2003) (criminalizing unlawful appropriation of property). At the time, Cabrera believed

---

[3]    Reynolds also reported Denny's illegal conduct to then-mayor Manuel Abrego, City Finance Director Ruth Hernandez, and then-councilwoman Ida Garcia. In their official capacities, any and all of the

Denny committed a crime; Garcia believed Denny committed a crime; the City's attorney believed Denny committed a crime; and Alderman Juan Sierra believed Denny committed a crime. *See* Ex. M, Sierrra Depo. at 14:20 – 15:9 (stating that he thought then and thinks now that the matter of Denny's abuse of City credit card should have been turned over to the Texas Rangers or the District Attorney's Office).

There are genuine issues of material fact regarding each element of Plaintiff's claim for relief under the Texas Whistleblowers Act.

### C.    The Reason For Plaintiff's Termination Is A Question Of Fact

Defendant asserts that Reynolds has the burden to prove that she would not have been terminated "but for" her report of illegal activity. While Reynolds certainly intends to meet this burden at trial, it is *Defendants'* burden at this stage of the proceedings to establish its affirmative defense, or negate Plaintiff's claim, as a matter of law. *See supra* at II. Again, Defendant's own summary judgment evidence, as well as the evidence submitted by Plaintiff, presents genuine issues for trial.

First, Defendants state various "reasons" for Plaintiff's termination other than Plaintiff's report. They cite no supporting evidence for the majority of those reasons. Defendants point the Court to the Garcia's affidavit, which includes no evidence regarding Reynolds' pay as interim finance director or Reynolds opening of unauthorized accounts."[4]

Defendants contend Reynolds was terminated for performance-related reasons. However, the letter of termination Reynolds received from Garcia gives no reason for

---

individuals were in a position to address any criminal activity by Denny.

[4]    These arguments are complete red herrings. For example, Defendants' records show that Reynolds opened a catalog account and that the catalog asked for Reynolds' general information in order to

Reynolds' termination other than the fact that she was an at-will employee of the City. *See* Ex. O. When Reynolds asked why she was being terminated, Garcia told Reynolds that no reason was needed and never stated that any performance-related issues were involved. *See* Ex. A at ¶6.

Defendants claim Reynolds was fired for failing to dock herself one day of pay. This issue is addressed *supra*; however, Paysmart, the City's payroll vendor, made an error and overpaid Reynolds. *See* Ex. P at p.2 (showing seventy-two hours but payment for eighty hours).[5]

The City librarian wrote a memorandum to then-City Attorney Tom Andrews in which Defendant claims Reynolds' performance is criticized. The memo was dated two months *after* Reynolds' discharge, so it can hardly be proof of performance concerns at the time the termination decision was made. *See* Ex. Q. Moreover, Reynolds had already addressed those issues before she was terminated. *See* Ex. U.

All of the so-called performance reasons for Reynolds' termination are after-the-fact concoctions by Defendants; they certainly are not the reason Reynolds was terminated. Tellingly, only one week after Reynolds' termination, Andrews provided a letter to Reynolds' counsel stating that the City did *not* have a reason for terminating Reynolds' employment other than cost-constraints. *See* Ex. R. For summary judgment purposes, however, these inconsistencies clearly establish a genuine issue of material fact for trial concerning the true reasons for Reynolds' discharge.

---

properly bill her. *See* Ex. N. Moreover, the City only discovered that information three months after terminating Reynolds. It could not have been the reason for her termination.
[5]    Reynolds received permission from Garcia the one time Reynolds called Paysmart to change her payment. The following pay period, Paysmart made a clerical error in Reynolds' favor.

In short, Defendant has failed to prove that it is entitled to summary judgment as a matter of law. Instead, the competent summary judgment evidence shows that genuine issues of material fact exist for trial. As a result, Defendant's motion for summary judgment should be denied.

## IV.    Plaintiff's *Sabine Pilot* Claim Must Be Decided By A Jury

In *Sabine Pilot Serv. Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985), the Texas Supreme Court recognized an exception to the employment-at-will doctrine, covering the discharge of an employee "for the sole reason that the employee refused to perform an illegal act." To prevail at trial, Reynolds must establish: (1) that the City required her to perform an illegal act; (2) that she refused to do so; (3) that she was terminated as a result; and (4) that the sole reason for her was her refusal to perform the illegal criminal activity. *See id.* at 735. To survive a motion for summary judgment, Plaintiff is not required to prove the elements of a *Sabine Pilot* claim; rather, Plaintiff need only offer evidence creating a fact issue challenging the City's alleged legitimate reasons for termination.

Reynolds was called into an executive session of the Los Fresnos' City Council meeting – in itself improper because she had not been placed on the agenda – and was told in no uncertain terms that the City was (1) in trouble with the HOME Program and (2) the City needed to produce timesheets for work done on the project. Reynolds told the council that there were no timesheets. Tom Andrews and the council told Reynolds to find them, despite the fact that she told them the records did not exist. As Reynolds was leaving the executive session, Alderman Gonzalo Acevedo blocked her exit from the room and told her in a low voice: "We need you to find those documents", the very

documents he now knew did not exist.[6]  Ex. A at ¶7.  The implication was clear to Reynolds – she was being told by the City Council to falsify timesheet.  On the morning of her discharge, Tom Andrews came to Paula Reynolds' office and asked about her progress in re-creating the timesheets.  *See id.* at ¶8.  Shortly after again explaining that timesheets had not been kept, Tom Andrews and Garcia entered Reynolds' office and Garcia terminated Reynolds.  *See id.* at ¶9.

Defendants argue that Reynolds was simply asked to "find" or "re-create" documents.[7]  As is common when one asks another to perform an illegal act, Defendants did so with subtlety and stealth.  *See Higginbotham v. Allwaste, Inc.* S.W.2d 411 (Tex. App. -- Houston [14th Dist.] 1994, writ denied).

Without any citation to authority, Defendants baldly state in their motion that Reynolds was not subject to any criminal liability if she had made up timesheets. Defendants cannot get their story straight – Defendant Abrego stated that it would be an illegal activity to falsify documents sent to the state.  *See* Abrego Depo. at 54:3 – 6. Regardless of what Defendants thought or baldly assert, Texas Penal Code § 37.10 makes it a crime "to knowingly make[] a false entry in, or false alteration of, a governmental record."  The timesheets were governmental records that were submitted to the HOME Program, a program run by the HUD and TDHCA.

---

[6]    Acevedo cannot remember whether Reynolds was ever in executive session.  *See* Ex. V, Acevedo Depo. 11:13 – 18.

[7]    They conveniently fail to mention that Reynolds told the Council that the documents did not exist to be found.  They also ignore that simply making up timesheets would be illegal. Denny did not keep track of her hours worked on the HOME Program.  *See* Ex. E.  Reynolds was the only Los Fresnos employee to keep contemporaneous timesheets of her work on the HOME Program.  *See* Ex. A at ¶7.

The competent summary judgment evidence shows that genuine issues of material fact exist for trial regarding Plaintiff's *Sabine Pilot* claim.  As a result, Defendant's motion for summary judgment should be denied.

### V.    Plaintiff's First Amendment Claim Must Be Decided By A Jury

Plaintiff alleges Section 1983 and 1985 claims for discrimination and retaliation based on Plaintiff's First Amendment rights.  There are four elements Plaintiff must establish to prevail on a First Amendment retaliation claim:  (1) she must suffer an adverse employment action; (2) she must establish that the speech involved a matter of public concern; (3) she must establish that the her interest in commenting on matters of public concern outweigh any interest the employer has in promoting efficiency; and (4) she must demonstrate the speech motivated or precipitated the employer's adverse action. *See Teague v. City of Flower Mound, Texas*, 179 F.3d 377, 380 (5th Cir. 1999); *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999).  Defendants challenge only the second element.[8]   Whether the speech involved a matter of public concern and whether the employee's interest as a citizen in commenting on the matters of public concern outweighed the interest of the state as an employer are legal questions determined by the Court.  *See Connick v. Meyers*, 461 U.S. 138, 147-48, n.7 (1983); *Teague*, 179 F.3d at 380.  Factual disputes concerning whether Plaintiffs' protected speech was a motivating factor in the adverse employment decision are left to the jury to resolve. *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001).

Matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146.   The Fifth Circuit has used two tests, sometimes together, to analyze whether

speech is properly categorized as relating to a matter of public concern. *See Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000). The first test is the "content-form-context test: '[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record.'" *Kennedy*, 224 F.3d at 366. The second test is called the "citizen-employee test: 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters *only* of personal interest,'" the speech is not considered to involve matters of public concern. *Id.*

In a number of cases, the Fifth Circuit has determined the reporting of official misconduct was protected speech under the First Amendment because it involved matters of public concern. "There is perhaps no subset of matters of public concern more important than bringing official misconduct to light." *Davis v. Ector County, Texas*, 40 F.3d 777, 782 (5th Cir. 1994). Additionally, the Fifth Circuit has held, "the disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 192 (5th Cir. 1988); *see also Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999) (holding speech involved a matter of public concern because the teachers "spoke . . . as elected representatives of the faculty . . . in compliance with their duties" while serving on a committee); *Thompson v. City of Starkville, Mississippi*, 901 F.2d 456 (5th Cir. 1990) (holding police officer who filed written grievance concerning unethical conduct of police officers who had received promotions spoke on matters of public concern).

---

[8]    Defendants do not challenge any other aspect of either Plaintiff's § 1983 or § 1985 claims.

Defendants attempt to portray Reynolds' complaints about the City's order to falsify government documents as "just a (sic) employment complaint." However, the City Council had instructed Reynolds to falsify public records that she knew would be delivered to the TDHCA and HUD. Because of the audit and investigation of Los Fresnos' administration of the HOME Program, Reynolds also knew or reasonably believed the falsified documents would be delivered to the Texas State Auditor's Office and the Office of the Inspector General of the United States Department of Housing and Urban Development. Reynolds was hardly complaining about a clerical assignment; she was arguing against falsify government records – an issue clearly of public concern.

Defendants' motion for summary judgment should be denied, and Plaintiff's Section 1983 and 1985 claims for retaliation based on protected speech should be resolved by the trier of fact.

### VI.    Plaintiff's Defamation Claim Must Be Decided By A Jury

To prevail at trial on her defamation claim against Defendant Tom Andrews, Reynolds must prove that Andrews: (1) published a statement (2) that was defamatory about the plaintiff (3) while acting with negligence regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998). The threshold issue of whether the words used are capable of a defamatory meaning is a question of law for the court. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex. 2000).

The conditional or qualified privilege Defendant asserts arises out of circumstances in which the allegedly false statement is published in a lawful manner for a lawful purpose. *Hearst Corp. v. Skeen,* 130 S.W.3d 910, 926 (Tex. App. -- Fort Worth 2004, pet. filed). That privilege, however, is an affirmative defense. *Denton Pub'g Co. v.*

*Boyd,* 460 S.W.2d 881, 884 (Tex. 1970). Andrews has the burden of proving that the communication is privileged. *Boyd,* 460 S.W.2d at 884. Furthermore, if Defendants were to establish a privilege, which Plaintiff denies even exists, the privilege is waived if it is abused. *Skeen,* 130 S.W.3d at 926. A privilege is abused when the person making the defamatory statement knows the statement is false or acts for some purpose other than protecting the privileged interest. *Id.* When the facts are undisputed and the language used in the publication is not ambiguous, the question of privilege is ordinarily one of law for the court. *See Dixon v. Southwestern Bell Tel. Co.,* 607 S.W.2d 240, 241 (Tex. 1980). Otherwise, it is a question of fact for the jury.

Defendant argues for summary judgment on two grounds. First, he argues he is entitled to a qualified privilege because he had a reasonable belief that a crime was committed and he was merely reporting it the police chief.[9] Second, he argues substantial truth is a defense. Neither argument withstands scrutiny.

Tom Andrews did not believe Paula Reynolds ever committed any crime. His own deposition testimony is that a class C misdemeanor would have fallen in municipal court and he would have been responsible, as the city attorney, for prosecuting it. A class C or higher misdemeanor is automatically referred to the district attorney's office. He neither prosecuted Reynolds nor referred Reynolds to the district attorney's office. Andrews Depo. at 92:11 – 94:21.

Despite his own belief that Paula Reynolds never committed any crime, Andrews requested the police department investigate her for overpaying herself. *See* Ex. T. The police department followed up on the request and recorded the witness statement of

former Los Fresnos Interim City Administrator Gene Daniels. *See* Ex. S. Mr. Daniels'

stated that he had discussed the issue with Reynolds nearly a year before her termination,

that nobody told Plaintiff to reduce her salary, and that the City never pursued the issue

with Reynolds. *Id.* The "criminal" investigation to stopped there.[10]

Simply, there is a genuine issue of material fact with regard to each element of

Reynolds' defamation claim. Andrews claims he never told anyone Reynolds was fired

for theft. Andrews Depo. at 107:19-23. On the other hand, Reynolds testified that

Andrews in fact told Mr. Cavazos to find information on Reynolds regarding theft and

told people she was a thief. Reynolds Depo. at 54:24 – 55:6; Ex. A at ¶¶14-15. Calling a

person a thief is a defamatory statement.

Defendant Andrews' knowledge of facts and negligence with regard to the truth

of his statements are issues of fact for the jury.

## VII.    Plaintiff's Intentional Infliction of Emotional Distress Claim Must Be Decided By A Jury

The Texas Supreme Court recognized the tort of intentional infliction of

emotional distress in *Tywman v. Tywman,* 855 S.W.2d 619 (Tex. 1993), and adopted the

elements set forth in the Restatement. *See* Restatement (Second) of Torts § 46 (1965). To

---

[9] Defendants fail to mention that in addition to informing the police chief, Andrews informed at least one other Los Fresnos citizen, Plaintiff's hairdresser Shawn Davis. *See* Ex. A at ¶15. Without this publication, Reynolds would have no knowledge of the City's criminal investigation.

[10] Defendants argument regarding the catalog account is a red herring. On its face, the bill states: "If you would like us to resolve this matter directly with your former employee, please provide us with some general information including, their home address, phone number, or new place of employment." Ex. N. The matter could have been resolved simply by forwarding the proper information to the catalog company or contacting Reynolds directly before suit or through her counsel after suit. Defendant also has the audacity to compare Reynolds' opening of an account using her own name with Denny's unauthorized and anonymous internet purchase of a radar detector. Thieves rarely use their own name. That maxim clearly distinguishes the two circumstances.

prevail on this cause of action, Plaintiff must show that (1) Defendant's actions were intentional or reckless; (2) Defendant's conduct was extreme and outrageous; (3) Defendant's actions caused her emotional distress; and (4) the resulting emotional distress was severe. *Twyman,* 855 S.W.2d at 621. Defendants do not address the first or third elements, instead arguing only that their conduct was not extreme and outrageous and that Reynolds has not suffered severe emotional distress. Defendants are incorrect on both counts.

The *Wornick* court defined outrageous conduct as conduct that is "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Wornick Company v. Casas,* 856 S.W.2d 732, 734 (Tex. 1993). In *Higginbotham v. Allwaste, Inc.,* the plaintiff sued his former employer for wrongful termination and intentional infliction of emotional distress alleging that his emotional distress was the result of losing his job after he refused to participate in illegal conduct. 889 S.W.2d 411 (Tex. App. -- Houston [14th Dist.] 1994, writ denied). The district court granted summary judgment in favor of the former employer, and the court of appeals reversed, holding that a genuine issue of material fact regarding whether the employee refused to perform any act, and whether any acts the employee refused to perform were illegal, precluded summary judgment. *Id.* at 414. Merely asking an employee to perform an illegal act automatically puts him to the unacceptable choice of doing the act or risking termination. *Id.* at 416. Consequently, terminating an employee for refusing to participate in an illegal act may be extreme and outrageous conduct. *Id.* at 416-17. *Higginbotham* stands for the proposition that if a plaintiff proves by a preponderance of the evidence that (1) the conduct he was asked to participate in would

have violated the law; (2) he refused to participate in the course of the illegal conduct; and (3) he was terminated for his refusal, then he has demonstrated his employer's conduct was extreme and outrageous. *Id.* at 416-17.

Moreover, whether Reynolds sought medical treatment is merely evidence of the severity of the emotional distress; it is not conclusive. Proof of feeling depressed, confused, frightened, angry, scared, and changes in physical appearance and demeanor can also establish emotional distress. *See, e.g., American Medical International, Inc., v. Giurintano,* 821 S.W.2d 331, 343 (Tex. App. -- Houston [14th Dist.] 1991, no writ); *State Farm Mutual Auto Ins. Co., v. Zubiate,* 808 S.W.2d 590, 600-01 (Tex. App .-- El Paso 1991, writ denied); *City of Ingleside v. Kneuper,* 768 S.W.2d 451, 460 (Tex. App. -- Austin 1989, no writ). Proof of visiting a doctor can support a claim of severe emotional distress; it is not the *only* or *exclusive* method of proving severe emotional distress.

In this case like in *Higginbotham,* Reynolds has alleged and proffered sufficient evidence to create a genuine issue of material fact and defeat Defendant's motion for summary judgment on the intentional infliction of emotional distress claim. As shown above, Defendants instructed Reynolds to perform illegal acts – falsifying government documents – and terminated her when she refused. Reynolds has suffered severe emotional distress, has had trouble sleeping, and has been depressed. She has been angry about the way she has been treated. She is nervous. *See* Ex. A at ¶16.

For these reasons, Defendants' motion for summary judgment against Plaintiff's claim of intentional infliction of emotional distress should be denied.

## VIII.   Defendants Are Not Entitled to Official Immunity

Government employees are entitled to official immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex. 1994). **Official immunity is an affirmative defense and the burden of proof is upon the defendant.** *Id.* Moreover, official immunity can only be determined after the trier of fact determines the circumstances surrounding Reynolds' termination. *See City of Alamo v. Holton,* 934 S.W.2d 833, 836 (Tex. App. – Corpus Christi 1996, no writ) (holding that material issues of fact regarding termination of employee suing under the Whistleblower Act precluded summary judgment for city on its qualified immunity defense based on its workers' immunity).

First, as demonstrated above, there are genuine issues of material fact with respect to Reynolds' termination.  Therefore, summary judgment based on official immunity is improper.  Even if the Court were to consider the individual Defendants' assertion of official immunity at this time, they have not met their burden.  They cite the Court to a case from the middle of the last century, then baldly assert – with neither analysis nor citation to precedential authority or evidence – their entitlement to immunity.  It is equally unclear from which cause or causes of action the individual Defendants are claiming immunity.

At any rate, the individual Defendants are not entitled to official immunity because they did not act in good faith.  Ida Garcia claims she decided to terminate Reynolds shortly before actually terminating her.  *See* Garcia Depo. at 67:17-19. Moreover, she claims to have fired Reynolds in order to save the City money, but she did

not know how much Reynolds made. *See id.* at 67:5-6. Garcia states she terminated Reynolds for failing to dock her pay, a story she admits hearing second hand and not confirming. *See id.* at 69:13-18. She felt it was not important to confirm the story because "I made my decision." *See id.* at 70:4-7.

Then-Mayor Manuel Abrego's testimony directly contradicts Garcia. According to his testimony, on the evening before terminating Reynolds, Garcia told him of her intention to terminate Reynolds for failing to dock her pay. Abrego Depo. at 55:6-11 . His recommendation was not to fire Reynolds until the story was verified. *See id.* at 55:15-19. Unlike Garcia, Abrego believes it was not fair to terminate Reynolds without confirming the story. *See id.* at 57:17-20.

Defendants have not conclusively demonstrated a legitimate reason for terminating Reynolds, nor have they demonstrated that her termination was in good faith. The individual Defendants have not met their burden of proof on this affirmative defense. Therefore, official immunity should be denied until the trier of fact can determine the circumstances of Reynolds' termination.

## IX.    Plaintiff Is Entitled To Punitive Damages

Defendants argue that Reynolds is not entitled to punitive damages under the Texas Tort Claims Act or the Texas Whistleblower Act. Be that as it may, Reynolds is entitled to punitive damages against the individual Defendants for her §§1983 and 1985 claim. *See Smith v. Wade,* 461 U.S. 30, 56 (1983); *Hinshaw v. Doffer,* 785 F.2d 1260, 1270 (5th Cir.1986) 42 U.S.C. § 1983. Moreover, punitive damages are permissible for a defamation claim. *See Bentley v. Bunton,* 94 S.W.3d 561, 604-05 (Tex. 2000) (upholding $1,000,000 in punitive damages in a defamation case). Defendants' broad statement

against punitive damages is not accurate. Upon proving her case to a jury, Reynolds will be entitled to punitive damages.

### X.    Conclusion and Prayer

For the foregoing reasons, Plaintiff prays this Court deny Defendants' motion and supplemental motion for summary judgment and allow Plaintiff's claims to proceed before a jury for final determination.

Respectfully submitted,

TERI L. DANISH
State Bar No. 05375320
Federal I.D. No. 12862
RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.
1201 E. Van Buren
Post Office Box 2155
Brownsville, Texas 78520
Telephone (956) 542-7441
Facsimile (956) 541-2170

Michael Rodriguez
State Bar No. 00791553
Federal I.D. No. 18759
Henri E. Nicolas, Jr.
State Bar No. 24014808
Federal ID No. 26052
RODRIGUEZ & NICOLAS, L.L.P.
319 East Elizabeth Street
Brownsville, Texas 78520
Telephone: (956) 574-9333
Facsimile: (956) 574-9337
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF CONFERENCE

Pursuant to the Southern District of Texas Local Rules, a certificate of conference is not necessary for this response to motion for summary judgment.

_____
Henri E. Nicolas, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy and correct copy of this instrument has on February 18 , 2005 been forwarded via certified mail, return receipt requested to:

**VIA
HAND DELIVERY &
CERTIFIED MAIL RETURN RECEIPT REQUESTED**
Eileen M. Leeds
WILLETTE & GUERRA, L.L.P.
1534 East 6th Street, Ste. 200
Brownsville, Texas 78520

_____
Henri E. Nicolas, Jr.