# EXHIBIT J

In The Matter Of:


# Paula Reynolds

## vs.

## The City of Los Fresnos, Texas, et al

---

### Deposition of

### Paula Reynolds

### Taken October 20, 2004

---

**Susan Pockrus, CSR**

**Pockrus Reporting Service**
**P. O. Box 531786 / Harlingen, TX. 78553**
**1.800.423.7713**

*E-Mail: PockrusRep@aol.com*

COMPLIMENTS OF
**POCKRUS**
COURT REPORTING SERVICE

Page

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAULA REYNOLDS        )
        PLAINTIFF     )
                      )
                      ) CIVIL ACTION NO: B-03-056
                      )   (JURY REQUESTED)
THE CITY OF LOS FRESNOS, )
TEXAS, TOM ANDREWS, MANUEL )
ABREGO, JUAN C. SIERRA,  )
IDA GARCIA, MIGUEL MENDOZA, )
RAY GARCIA, GONZALO ACEVEDO, )
AND PAM DENNY INDIVIDUALLY )
AND IN THEIR OFFICIAL     )
CAPACITIES                )
        DEFENDANTS        )

*****************************************

ORAL DEPOSITION OF

PAULA REYNOLDS

OCTOBER 20, 2004

*****************************************

ORAL DEPOSITION of PAULA REYNOLDS, produced as a

witness at the instance of the Defendants, and duly

sworn, was taken in the above-styled and numbered cause

on the 20th day of October, 2004, from 2:00 p.m. to

3:50 p.m., before SUSAN POCKRUS, CSR in and for the State

of Texas, reported by oral stenography, at the offices of

Rodriguez & Nicolas, L.L.P., 319 East Elizabeth,

---

APPEARANCES

FOR THE PLAINTIFF:
  Ms. Teri Danish
  RODRIGUEZ, COLVIN & CHANEY, L.L.P.
  1201 East Van Buren
  Brownsville, Texas  78520

  -AND-

  Mr. Henri E. Nicolas, Jr.
  Mr. J. Andrew Casey
  RODRIGUEZ & NICOLAS, L.L.P.
  310 East Elizabeth
  Brownsville, Texas  78520

FOR THE DEFENDANTS:
  Ms. Eileen M. Leeds
  Ms. Analisa Figueroa
  WILLETTE & GUERRA, L.L.P.
  1534 East 6th Street, Suite 200
  Brownsville, Texas  78520
ALSO PRESENT:
  Ms. Susan Pockrus, CSR
  Mr. Richard Wharburton (City Counsel)

---

Page 2

Brownsville, Texas 78520, pursuant to the Federal Rules

of Civil Procedure and the provisions stated on the

record or attached hereto.

-oOo-

---

Page 4

1           TABLE OF CONTENTS
2                         PAGE
3  Agreements of Counsel . . . . . . . . . . . . . . . 4
4
5  Examination of PAULA REYNOLDS
6    By Ms. Leeds . . . . . . . . . . . . . . . . . 7
7
8  REPORTER'S CERTIFICATION . . . . . . . . . . . . . 77
9  CHANGES AND SIGNATURE . . . . . . . . . . . . . . 79
10 WITNESS' SIGNATURE CERTIFICATE . . . . . . . . . . 80
11
12 OBJECTIONS
13    By Ms. Danish  . . . 11, 17, 18, 40, 43, 50, 54,-57
14 68-70, 74
15
16 EXHIBITS
17   (None were marked)
18
19
20
21
22
23
24
25

Page 5

## A G R E E M E N T S

1
2      It was agreed by and between counsel for the
3  Plaintiff and Defendants that no objections need be made
4  by any party at the time of taking said deposition,
5  except objections as to the form of the question or the
6  responsiveness of the answer, which if not made during
7  the deposition are waived; but if and when said
8  deposition, or any portion thereof, is offered in
9  evidence at the trial of this cause by any party thereto,
10  it shall be subject to any and all legal objections, such
11  objections to be made at the time of tender, the same as
12  though the witness were on the stand personally
13  testifying;
14      It was further agreed that the original
15  deposition transcript was delivered to PAULA REYNOLDS, in
16  care of Ms. Teri Danish, RODRIGUEZ, COLVIN & CHANEY,
17  L.L.P., 1201 East Van Buren, Brownsville, Texas 78520,
18  for examination and signature and is to be returned to
19  Pockrus Reporting Service. If and when the original
20  deposition transcript is returned with the correction
21  sheet containing the changes made by the witness, if any,
22  a copy of the changes will be forwarded to all counsel of
23  record;
24      It was further agreed that in the event the
25  original deposition is not signed by the witness within

Page 6

1  thirty (30) days and filed at the time of trial or
2  hearing, that the original or a certified copy of said
3  deposition may be filed in Court and used herein as
4  though the witness had signed original deposition.
5
6              -o0o-
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

## P R O C E E D I N G S
*
PAULA REYNOLDS,
4  having been first duly sworn, testified as follows:
*
## E X A M I N A T I O N
7  BY MS. LEEDS:
8      Q. Ms. Reynolds, would you please state your name
9  for the record.
10      A. Paula Reynolds.
11      Q. Are you currently employed?
12      A. Yes.
13      Q. Where?
14      A. It's a long name:  The University of Texas
15  Health Science Center of San Antonio Regional Academic
16  Center Police Department.
17      Q. Where is that, San Antonio?
18      A. The home office is in San Antonio.
19      Q. Okay.
20      A. I'm based in Harlingen behind Valley Baptist.
21      Q. Okay.  Oh, is that -- is that Regional Health
22  Center, that RAC --
23      A. RAC.
24      Q. Is that a San Antonio-affiliated thing?
25      A. Uh-huh, uh-huh.

Page 8

1      Q. Okay.  Even though you and I understand "uh-
2  huh," she's got to -- yes, right.  And so I'm going to be
3  doing that to you, but I don't mean to, you know, be
4  disrespectful or anything like that.  It's just that I'm
5  sure eventually she'll say, Is that a yes?  So before she
6  says that.
7      How long have you been employed there?
8      A. Two-and-half years, approximately.
9      Q. What are your duties there?
10      A. I'm the administrative secretary.
11      Q. For the police department?
12      A. For the police department.
13      Q. How many officers are employed?
14      A. Six.
15      Q. Do you know if they are peace officers or --
16      A. Certified Texas Peace -- Texas Peace Officers.
17      Q. You said two-and-a-half years.  How long were
18  you without employment between Los Fresnos and this
19  employment?
20      A. Four months.
21      Q. And did you have any other kind of employment
22  in between your Los Fresnos employment and your
23  RAC employment?
24      A. No.
25      Q. Can you tell me what your education is?

Page 9

1    A. I've had some college.
2    Q. All right. Where did you graduate from
3  high school?
4    A. Permian High School, Odessa, Texas.
5    Q. What brought you to south, South Texas?
6    A. My husband, he's from here and he took a job
7  down here.
8    Q. Are you currently married?
9    A. We are separated.
10   Q. And is this the same husband that brought you
11 down here?
12   A. Correct.
13   Q. What's his name?
14   A. Dan Reynolds.
15   Q. Funny how that works, he's got the same name as
16 you do. I joke too much. So if it offends you just let
17 me know.
18      How long have you been married?
19   A. 14 years.
20   Q. Any children?
21   A. Two Children; two daughters.
22   Q. Any over the age of 18?
23   A. I have four children total, two with him. And
24 no, I have no children over the age of 18.
25   Q. Okay. Do you have any other family in

Page 10

1  Cameron County?
2    A. No.
3    Q. Does he have any other family in Cameron County?
4    A. No, I believe they're all in Hidalgo; Weslaco,
5  McAllen.
6    Q. Okay, that's Hidalgo. Okay. Where did you go
7  to college that "some" that you had?
8    A. Odessa College, Odessa, Texas.
9    Q. How was -- the "some," how much was that?
10   A. Just six to seven months at the most.
11   Q. Maybe one full semester?
12   A. Maybe.
13   Q. Or one full school year?
14   A. I don't think it was a full school year.
15   Q. Were you enrolled in any particular program?
16   A. It was mainly the secretarial program.
17   Q. Did you get some kind of certificate or --
18   A. No, it had math and all that all that other
19 stuff, though.
20   Q. When did you come down to the Valley?
21   A. We arrived here in May of '96.
22   Q. Where were you first employed?
23   A. The City of Los Fresnos.
24   Q. Okay. And did that remain your soul source
25 of employment until -- until they -- they terminated you

Page 11

1  in --
2        MS. FIGUEROA: February 2002.
3    Q. (BY MS. LEEDS) -- February 2002?
4    A. Yes.
5    Q. Okay. We are here, as you well know, because of
6  a lawsuit you filed against the City of Los Fresnos and
7  certain individuals. One of the claims you are serving
8  is called a whistle blower claim. Are you familiar with
9  that term?
10   A. Yes.
11   Q. What do you understand that term to mean?
12      (Mr. Wharburton enters conference room.)
13      MS. LEEDS: There he is. I know you would
14 show up, eventually. This is Dick Wharburton, the City
15 attorney.
16      (Off the record at 3:15 p.m.)
17      (On the record at 3:16 p.m.)
18   Q. (BY MS. LEEDS) If I recall correctly, my
19 question was, what do you understand that term to mean?
20   A. The Whistle Blower Act?
21   Q. Yes.
22   A. A -- the whistle blower --
23      MS. DANISH: I'm going to object to the
24 extent it calls for a legal conclusion, but you can try
25 to tell her.

Page 12

1        MS. LEEDS: Right.
2    Q. (BY MS. LEEDS) I just want your understanding.
3    A. The Whistle Blower Act to me is an employee who
4  finds another employee doing something that is wrong
5  within the company, be it illegal, and they report it to
6  the proper authorities.
7    Q. And you believe that you found another employee
8  doing something wrong within the City, because that's the
9  company you're referring to here --
10   A. Correct.
11   Q. -- and you reported it?
12   A. Yes.
13   Q. Okay. Who was or are the employees who you
14 found doing something wrong?
15   A. Pam Denny, the City secretary.
16   Q. Are there any other employees who you found
17 doing something wrong?
18   A. Not that I recall.
19   Q. Okay. And you believe that she engaged in
20 some activity that was wrong for the City, within the
21 City --
22   A. Correct.
23   Q. -- and you reported it?
24   A. Correct.
25   Q. Who did you report it to?

**PAULA REYNOLDS**                    CondenseIt™                    10/20/04

Page 13

1   A. I reported it to Adrian Cabrera.
2   Q. And just for the record, he was the --
3   A. Interim City police chief.
4   Q. Police chief, okay.
5   A. To the then mayor, Manuel Abrego; to Ida Garcia.
6   She was a council member; to Ruth Hernandez who was the
7   finance director at the time; and I believe I also
8   brought it up to Yolanda Perez and Sarah Garcia.
9   Q. Who was Yolanda?
10  A. She was one of the girls who sat up at the
11  front. They took the water payments and things like
12  that.
13  Q. Okay. Clerk --
14  A. Clerk.
15  Q. -- in the City?
16  A. Uh-huh.
17  Q. And I'm sorry, who was the last person you said?
18  A. Sarah --
19  Q. Sarah Garcia?
20  A. I think that's her name.
21  Q. Who was she?
22  A. Also a clerk.
23  Q. Of this list who was first?
24  A. The actual first person was Adrian Cabrera.
25  Q. All right. Who followed him?

Page 14

1   A. Manuel Abrego and Ida Garcia.
2   Q. Were they together or --
3   A. No separately.
4   Q. -- one after the other?
5   A. One after the other.
6   Q. Okay. So Adrian first, Manuel second,
7   Ida third, Ruth?
8   A. She was fourth.
9   Q. All right. Did you -- okay. What about
10  Yolanda?
11  A. Let me switch -- may I switch that?
12  Q. Sure.
13  A. Let me put Ruth third and Ida fourth.
14  Q. Okay, Ruth third and Ida fourth.
15  A. Uh-huh.
16  Q. Okay. What about Yolanda and Sarah?
17  A. Fifth and sixth.
18  Q. In that order?
19  A. Yes.
20  Q. Okay. Do you recall when you -- well, let me
21  ask you, what was the wrongdoing that you found?
22  A. I had received a Visa bill that was the City's
23  Visa card and there was a charge on there that I could
24  not -- could not identify.
25  Q. And what was wrong about that?

Page 15

1   A. It was to -- I don't remember the name of the
2   company off the top of my head. And I went -- I called
3   the company and -- to find out who they were and what the
4   purchase was for. If I remember correctly, it only said
5   they were X-company and it was a 400-and-something-dollar
6   purchase. And so I called the company to find out who
7   they were and what the purchase was.
8   Q. Okay. And so you found out that somebody had
9   purchased something. What led you to believe that that
10  was a wrongdoing?
11  A. I was on the phone with the people at the
12  company and they told me that a radar detector had been
13  purchased, and I asked them who purchased the radar
14  detector -- because we, of course, had a police
15  department -- and they said it was a Pam Denny.
16  Q. Okay. And what led you to believe that that was
17  wrong?
18  A. I then went into Pam Denny's office and she was
19  typing at the typewriter. And I said -- I told her what
20  I had found out that they said it was a radar detector
21  that had been purchased by a Pam Denny. Adrian Cabrera
22  was sitting there and I asked him, Did you buy a new
23  radar detector for the City? And he said, No, we haven't
24  purchased any. And Pam took the piece of paper from me
25  and said it was a mistake.

Page 16

1   Q. Okay. What else did she say -- I mean, where in
2   all of this did you determine there was wrongdoing?
3   A. The fact -- I asked her about the radar detector
4   and she indicated that she had made a purchase for her
5   daughter -- can't think of her name -- Missy Denny, and
6   that she had accidentally used the City credit card while
7   making the purchase instead of using her personal
8   Visa card.
9   Q. Okay. At this point, had you determined there
10  was wrongdoing?
11  A. Uh-huh.
12  Q. Okay.
13      THE REPORTER: Yes or no, please.
14  Q. (BY MS. LEEDS) Told you. Okay. So at the
15  point at which you determined there was wrongdoing is
16  when Ms. Denny told you how she had come to purchase the
17  item that was being billed to the City? In other words,
18  she -- Pam Denny was telling you that she had made that
19  purchase mistakenly for her daughter?
20  A. Correct.
21  Q. And she had used the wrong credit card?
22  A. Also, the man that I spoke to at this company
23  told me that the purchase was made via the internet.
24  Q. Uh-huh.
25  A. And we did not have the internet at City Hall at

**PAULA REYNOLDS**                    *CondenseIt*™                    **10/20/04**

Page 17

1    that time.
2    Q. Was there any policy at the City of Los Fresnos
3    that proper purchases could not be made via the internet?
4    A. I'm not aware of those.
5    Q. So purchasing from the internet wasn't enough
6    to say, Hey, that's wrongdoing, was it?
7    A. Well, seeing how the City didn't have internet
8    access in the City Hall, I don't know how it was made
9    using the internet.
10    Q. Okay. Well, could Chief Cabrera had used a
11    computer someplace else to purchase a radar for their
12    police cars?
13    A. He had already said he did not purchase that.
14    Q. I'm giving you a hypothetical.
15    A. I guess.
16    Q. Okay. Would it had been wrong for the chief of
17    police to purchase a radar detector through the internet?
18       MS. DANISH: Objection; form. I had to do
19    that. You can answer. Unless I tell you not to answer,
20    you have to answer.
21    A. If he has proper authorization.
22    Q. (BY MS LEEDS) Okay. And that's what I'm trying
23    to get to. Just the fact that it had been purchased
24    through the internet wasn't enough to say, That's
25    illegal, right? I mean, it's enough for maybe you to

Page 18

1    question but not automatically think that's wrong because
2    there's no wrongdoing there?
3       MS. DANISH: Objection; form.
4    Q. (BY MS. LEEDS) If it's a proper purchase.
5    A. There is no wrongdoing if it was a proper
6    purchase authorized by City personnel for this
7    transaction to take place.
8    Q. Okay. And you got to that conclusion, that it
9    was not authorized properly, when Pam Denny told you that
10    she had made that purchase for her daughter?
11       MS. DANISH: Objection; form.
12    A. Correct.
13    Q. (BY MS. LEEDS) Right?
14    A. Uh-huh.
15    Q. Okay. Did you speak to Chief Cabrera at any
16    time about this situation at any time other than the time
17    he was in Ms. Denny's office with her?
18    A. Yes, I spoke to him. I believe we were back in
19    the kitchen.
20    Q. The kitchen?
21    A. Of the City Hall.
22    Q. Lunchroom?
23    A. Yeah.
24    Q. Was that that same day?
25    A. I don't remember.

Page 19

1    Q. And what was discussed there?
2    A. Just that she had used the City Visa card for
3    this purchase for a personal purchase.
4    Q. What did Chief Cabrera tell you about it?
5    A. He pretty much made light of the whole thing.
6    Q. Did he actually say to you he didn't think that
7    there was any wrongdoing?
8    A. No, he did not say that.
9    Q. Okay. Did he say anything to you about, Oh, it
10    was a mistake, don't worry about it?
11    A. No, he did not say that.
12    Q. Okay. If you can tell me, how was it that he
13    made light of it, then?
14    A. I don't know any other word to use, but he just
15    fluffed it off.
16    Q. Okay. After the conversation in the kitchen --
17    well, do you remember what you said to him?
18    A. I just reiterated to him, I said, Are you sure
19    you didn't purchase this for? And he said, No, Paula, we
20    haven't bought any new radar detectors. I just was still
21    trying in my own mind to figure out what was going on.
22    And he said, No, we haven't made any purchases, and
23    that's about where we left it. He just -- he didn't seem
24    interested in asking me any questions or anything.
25    Q. Did you ever speak to him about that issue after

Page 20

1    that conversation in the kitchen?
2    A. I don't recall.
3    Q. When did you report it to the mayor?
4    A. That day.
5    Q. And do you recall your words to the mayor?
6    A. No, I do not recall my words. They were
7    something to the effect that I had received the Visa bill
8    and on it was a strange purchase, as I did with any
9    purchase that I wasn't familiar with. When they purchase
10    something they're supposed to turn in the receipt, and I
11    had no receipts to go with this purchase. And so I had
12    called the company and I explained to them what happened,
13    and they told me that a Pam Denny had made the purchase
14    via the internet.
15    Q. Okay.
16    A. And I believe they also said it was in the
17    evening time.
18    Q. Okay.
19    A. Late in the evening.
20    Q. What was your position at the time?
21    A. I was -- I had so many different job duties,
22    I don't remember.
23    Q. Okay.
24    A. I believe I was accounts payable. I was helping
25    Ruth Hernandez with accounts payable.

Page 21

1  Q. All right. So were you responsible for
2  determining whether or not -- or not whether or not, but
3  were you responsible for paying bills that came into the
4  City?
5  A. Not at that time.
6  Q. No?
7  A. It was Ruth Hernandez. She was still there, and
8  I would help her prepare what was to be paid that had a
9  set -- if I remember correctly, there was a set dollar
10  amount a week and you made the most pressing at that
11  time.
12  Q. Okay. But it was part of your responsibility to
13  find out if each bill that came in had undergone proper
14  procedure? In other words, let's not take the Pam Denny
15  situation, but if you had received a bill or something
16  else that you did not recognize and you did not have a
17  written receipt for, what would you have done?
18  A. I would had gone then to, say, like, the water
19  department and asked if they had any outstanding receipts
20  that needed to be turned in.
21  Q. So that was part of your duties at that time?
22  A. Correct.
23  Q. Investigate the purchases that came in on a
24  bill?
25  A. Uh-huh.

Page 22

1  Q. To verify that they were correct and that the
2  City should pay them?
3  A. Right.
4  Q. I hate to do this, but can we go through all the
5  different positions you've had in Los Fresnos? I'm not
6  sure if I understand.
7  A. When I was hired, I was hired as the -- I don't
8  remember the exact wording. The then CDC Director was
9  John Guevara, community development director. I was
10  hired as the community development director secretary,
11  if that's what you want to call it, and I don't remember
12  the exact title.
13  Shortly after that, because of all the many
14  personnel changes that have taken place in the City of
15  Los Fresnos, I went -- I never -- that official title was
16  never taken away from me. That was always what they
17  called me in any capacity that I remember also.
18  I did work in -- from there they moved the
19  CDC office over and combined it with the Chamber of
20  Commerce office over on Ocean Boulevard, and I was moved
21  over there. And then due to the fact that Don Badeaux
22  was involved with the Chamber, they didn't want the
23  CDC files over there. So in the middle of the night I
24  get a phone call from Paul Chavez saying I'm being moved
25  back to City Hall. He was now the CDC person and in the

Page 23

1  morning I'm supposed to report back to the 200 North
2  Brazil location.
3  And from there -- when I was there originally
4  I had had an office, but when I moved back I had no place
5  to go, no desk, no nothing. And Paul had pretty well
6  taken most of the CDC -- he wasn't good at delegating.
7  He'd taken over most of it himself.
8  I would still do things, but then they -- to
9  help Ruth out -- no, it was Ron at the time. To help
10  Ron out I started doing the accounts payable and I would
11  do accounts payable. I've helped out in front with
12  Yolanda and Sarah on several occasions. I used to take
13  minutes for the CDC. Of course, I was the secretary so
14  I would attend the meetings and take the minutes.
15  With all the various changes then it ended up
16  I -- Mr. Reyna took the insurance away from Pam and I
17  started taking over that, but I only did that just a
18  month or two. And by the time I left it was mainly
19  accounts payable and payroll.
20  Q. Okay. I'll go over that. Were you at one time
21  finance director -- interim finance director?
22  A. They gave me that title.
23  Q. And what did you do when you were interim
24  finance director?
25  A. Primarily payroll and accounts payable.

Page 24

1  Q. Why did they call you that, then?
2  A. They -- this was right after Ruth had left, and
3  since I had been working closely with Ruth and they had
4  the position they just gave me that title.
5  Q. So you started doing what Ruth had been doing?
6  A. Uh-huh. I had a one-week crash course with
7  Ruth.
8  Q. With Ruth, you said?
9  A. Before she left, yes.
10  Q. In any of these changes of positions were there
11  changes in your salary or in your payment or your income?
12  A. Not that I recall.
13  Q. Did you get an increase when you were made
14  finance director?
15  A. Not that I recall.
16  Q. Okay. Do you remember when a finance director
17  came in and took that position basically over again?
18  A. I don't remember the month at all.
19  Q. Do you remember the year?
20  A. I don't remember --
21  Q. Do you remember the year?
22  A. No.
23  Q. Do you know or do recall at all if you were ever
24  directed to reduce your salary because you had continued
25  receiving an increase in salary because -- while you were

**Page 25**

1  finance director?

2      A. No.

3      Q. Tell me how you and Pam Denny got along or

4  didn't.

5      A. Originally, I did not feel welcome. Then over

6  time, I thought things had improved to some degree. And

7  then when all the changes started taking place we just

8  didn't get along anymore too well.

9      Q. When you say all the changes --

10     A. All the firings and the leavings and all that.

11     Q. Okay. Was this after the financial crisis hit

12  the fan?

13     A. No, this was before the financial crisis.

14     Q. In specific who was fired?

15     A. Everybody.

16     Q. Well, you weren't at that time. She wasn't at

17  that time.

18     A. Okay. It started with Don Badeaux.

19     Q. Okay.

20     A. Then it went to Chief Tony Lopez. And I believe

21  that's when Adrian came on as interim chief. You want

22  just the ones fired?

23     Q. Well, I want to know --

24         MS. LEEDS: Strike that.

25     Q. (BY MS. LEEDS) You said that you were getting

**Page 26**

1  along fine with her until all the changes started

2  happening.

3      A. And the changes started -- all the changes

4  started happening with Mr. Badeaux, which was shortly

5  after I came on board.

6      Q. When you came on?

7      A. No, when he was fired.

8      Q. When he left. Okay. So after Mr. Badeaux left,

9  you say the changes as in people getting fired started

10  happening?

11     A. Yes.

12     Q. Okay. And other than Chief Lopez, can you think

13  of anybody else who was let go?

14     A. Let go in any capacity?

15     Q. Uh-huh.

16     A. Or left on their own free will?

17     Q. Well, just not working with the City anymore.

18     A. Okay. The rundown, as I was there, it started

19  with Don Badeaux; it was Tony Lopez; if I remember

20  correctly, within weeks it was -- or months it was

21  John Guevara; it was Darla Honea; then Paul Chavez was

22  hired to take John Guevara's place.

23         At this point, somebody had been named interim

24  City administrator, and I believe -- I'm not sure if it

25  was Pam at that time. I know at some point she was.

**Page 27**

1  Paul came on board then. Darla was still there -- I'm

2  sorry, Darla was still there. Paul came on board, Darla

3  was leaving. Then they hired Ron for the finance

4  director. And at some point in here, they hired some

5  guy from Dallas and he was the new -- the new City

6  administrator, a little, bitty guy. He was there only

7  a few months. He was fired.

8          Then they hired Rick Perez as the chief of

9  police. He was then fired. And so now we're still with

10  Paul, and me, and Yolanda, and Sarah, and Pam, and

11  Bobbie. And then Paul -- then Ron quit and Ruth

12  Hernandez came on board. Oh, I'm sorry, also during this

13  time Tony Betancourt, the EMS director, was fired. They

14  made Joseph Hernandez the EMS director and then Paul

15  quit.

16         So then it was Ruth as the finance director.

17  It's all so confusing. Then she quit and they made me

18  her the interim finance director. I think at this point

19  we moved to the new City Hall and Alma Villarreal became

20  CDC director. They then hired some guy, I want to say

21  Ed, as finance director. And then they hired Johnny

22  Cavazos as chief of police. Then they fired Ed and then

23  they hired Candy Medina as finance director, and that was

24  about it.

25     Q. That brings us to 2002. Was Chief Cavazos chief

**Page 28**

1  in 2002?

2      A. He was still chief when I left.

3      Q. What of all of these positions were you when you

4  made your report about Pam Denny?

5      A. I still had the official title as the

6  CDC secretary, but I was just working as a backup for

7  Ruth. I didn't have an official title at the time, that

8  I recall.

9      Q. And she was the finance director at the time?

10     A. Yes.

11     Q. Okay. Other than accounts payable and payroll,

12  what were your other duties during that period of time?

13     A. While Ruth was still finance director?

14     Q. Yes.

15     A. I still attended the CDC meetings and -- and

16  took minutes.

17     Q. Okay. After Ruth left, then that's when you

18  were made finance director -- interim finance director,

19  correct?

20     A. Correct.

21     Q. How long?

22     A. I don't recall.

23     Q. Over a year?

24     A. I don't recall.

25     Q. And is that when Ed came on, took your place?

Page 29

1    A. After we -- yeah, we were at the old building
2  during this time and then we moved to the new building.
3  And when we got to the new building Ed came on.
4    Q. But you stayed doing the same job you had been
5  doing?
6    A. Correct.
7    Q. Okay. Ida Garcia: She was the councilwoman
8  that you spoke to, right?
9    A. Uh-huh.
10   Q. Did you ever have any other conversations with
11 her other than your reporting of this issue?
12   A. Repeat that.
13   Q. Yeah, I don't think it was very good. You
14 reported this issue to her, correct?
15   A. Correct.
16   Q. Describe that conversation.
17   A. I called her -- I don't remember where she was,
18 it may have been her cell phone or her home phone -- and
19 told her exactly what I had found out.
20   Q. Okay. Did she say anything to you?
21   A. Yes, she was not very happy.
22   Q. Did she say that, I'm not very happy, or what
23 did she say?
24   A. She said something to the effect, This is not
25 good, something along those lines.

Page 30

1    Q. Okay. Do you know -- well, did she ever tell
2  you she did or said anything to anyone after your
3  conversation with her?
4    A. Repeat.
5    Q. Yes. You had this initial conversation with
6  her, correct?
7    A. Uh-huh.
8    Q. Did she ever tell you that she did anything
9  about what you told her or said anything to anyone about
10 what you told her?
11   A. Not initially. She did let me know, however,
12 that the City Council would be investigating this and
13 some sort of action would be taking place. Those weren't
14 the exact words but --
15   Q. That's the gist?
16   A. The gist.
17   Q. How many conversations did you have with
18 Ms. Garcia after your initial report about this issue?
19   A. I don't recall. There were at least over two.
20   Q. Okay. Well, we know of two --
21   A. Right.
22   Q. -- because of the two you've related to us.
23   A. Right.
24   Q. Do you recall any others?
25   A. Yes.

Page 31

1    Q. What is the gist of what you recall with them?
2    A. She would be -- Ruth would be there and we would
3  be back in the back and she would just give us an update
4  on to how the whole thing was progressing, as to what was
5  going to potentially happen.
6    Q. What did you understand was going to potentially
7  happen?
8    A. I -- that either Pam would be reprimanded or
9  Pam would be terminated.
10   Q. And what happened?
11   A. It was investigated by some attorneys,
12 I believe, in McAllen. I do know that they came up
13 with a finding. They presented that finding to the
14 City Council, and the City Council did not act upon the
15 finding that the attorneys recommended.
16   Q. What was the finding that they recommended?
17   A. If I remember correctly, termination.
18   Q. Was this on a document, their finding?
19   A. Yes.
20   Q. Okay. Do you remember the names of the
21 attorneys?
22   A. May I ask who you're with?
23   Q. We're not from McAllen.
24   A. Okay.
25   Q. Willette & Guerra.

Page 32

1    A. You're with Willette & Guerra? I was going to
2  say Willette & Guerra.
3    Q. Okay. Not.
4    A. No, I don't.
5    Q. Okay.
6    A. They were pretty -- they were the City's
7  attorneys in some capacity for quite a while, I do know
8  that.
9    Q. Okay. How did you know that this was their
10 finding?
11   A. It was brought to my attention.
12   Q. By whom?
13   A. I don't remember by whom.
14   Q. Was it one of the Council members that told you
15 that?
16   A. It could have been, yes.
17   Q. Okay. Because this is something dealing with
18 personnel that's talked about in Executive Session,
19 right?
20   A. I have no clue what's talked about in the
21 Executive Session.
22   Q. You never attended a City Council meeting?
23   A. A City Council meeting?
24   Q. Uh-huh.
25   A. Uh-huh. But Executive Session is different than

**PAULA REYNOLDS**                     **CondenseIt™**                     **10/20/04**

| Page 33 | Page 35 |
|---|---|

**Page 33**

1　City Council.
2　Q.　Right.　Do you know what -- and I'm not asking
3　if you ever attended an Executive Session, but do you
4　know if personnel matters -- are those things that are
5　discussed in Executive Session?
6　A.　I -- I assume it would be.
7　Q.　Okay.　I'm not asking what your assumption is.
8　Do you know?
9　A.　No, I don't know.
10　Q.　And so it's your testimony that these attorneys
11　recommended termination, correct?
12　A.　Uh-huh.
13　Q.　And that the City --
14　　　　MS. DANISH: Yes?
15　A.　Yes.
16　Q.　(BY MS. LEEDS)　And the City Council did not
17　follow them?
18　A.　Correct.
19　Q.　What did the City Council do?
20　A.　I don't remember, but they did not terminate
21　her.
22　Q.　Did they reprimand?
23　A.　I think she had a reprimand of maybe two weeks
24　without pay, but I don't recall the exact.
25　Q.　Have you ever been reprimanded by the

**Page 34**

1　City Council?
2　A.　Yes.
3　Q.　Under what circumstance?
4　A.　I had called Yolanda Perez a bitch.
5　Q.　Okay.　Yolanda was one of the people you spoke
6　to, right?
7　A.　Uh-huh.
8　Q.　Okay.
9　　　　MS. DANISH: Yes?
10　Q.　(BY MS. LEEDS)　Yes?
11　A.　Yes.
12　Q.　When did this happen?
13　A.　I don't recall.
14　Q.　Before or after the report about Pam Denny?
15　A.　After.
16　Q.　Do you remember the circumstances under which
17　this argument occurred -- was it an argument?
18　A.　It was -- yes, it was an argument.
19　Q.　Okay.　Do you -- let me re-ask the question.　Do
20　you recall the circumstances --
21　A.　Yes, I do.
22　Q.　Okay, go ahead.
23　A.　You want the whole lengthy story?
24　Q.　No, just give it to me in a nutshell.
25　A.　Okay.　I had made arrangements with Yolanda to

**Page 35**

1　pay my water bill late.　I didn't have the funds at the
2　time.　I had done this many times in the past and Yolanda
3　said, Don't worry about it.　Okay.
4　　　　And one morning I came into the office and I
5　noticed that there was one single disconnect notice up on
6　the clip, and I went over to it to look at it because all
7　the other disconnects had already been taken care of and
8　it was mine.　And I went in and I confronted Yolanda and
9　I said, Why are you doing this?　We already had
10　arrangements.　I was going to pay you.　I've done this in
11　the past.　Why are you changing it now?
12　　　　And she just said that I was nobody special and
13　that I had to pay it or be disconnected.　And I told her
14　that she and I had an agreement and she'd always honored
15　it in the past and why was she not honoring at this time.
16　And that's what it's all about.
17　Q.　Okay.　Would you agree with me that nobody
18　should have special treatment, not even if you work for
19　the City?
20　A.　Other people had made arrangements to pay their
21　water bill late without being turned off.　I did the same
22　thing that anybody else did.
23　Q.　Okay.　Would you agree with me that nobody
24　should have special treatment?
25　A.　No.

**Page 36**

1　Q.　You don't agree with me?
2　A.　I think that as in the case of any other water
3　customer for the City of Los Fresnos I made arrangements
4　just like any other customer she dealt with.　And she
5　wasn't honoring.　She didn't -- she allowed the other
6　people to pay late, but she wasn't allowing me to pay
7　late.
8　Q.　Okay.　What was your -- I don't want to say
9　punishment, but what was your reprimand?
10　A.　One day's wages.
11　Q.　One day's wages?　And did you -- you're in
12　charge of payroll at this time, right?
13　A.　Correct.
14　Q.　Did you deduct yourself one day's wages?
15　A.　Yes, I did.
16　Q.　Okay.　Did you have any other -- you've told us
17　about one argument with -- is this the only reprimand?
18　That's going to look horrible, start over.
19　　　　Is this the only reprimand you had from the
20　City?
21　A.　Yes.
22　Q.　Did you have any other arguments, aside from the
23　one you told me about Yolanda, with anybody else at the
24　City Hall?
25　A.　I don't know if you would call it an argument.

Page 37

1  I had a problem with somebody else at the City Hall.
2  Q. Okay. Tell me about the problem
3  A. It was harassment by this individual.
4  Q. Well, tell me who it was and what happened.
5  A. It was -- her real name is Roberta La Gant.
6  They called her Bobbie La Gant.
7  Q. La Gant?
8  A. Uh-huh.
9  Q. Two words, one word?
10 A. Two words, L-a G-a-n-t. She worked somehow in
11 the court. She entered tickets or something in the
12 computer, I don't remember.
13 Q. Okay. Well, what's the problem?
14 A. Bobbie's office, as I'm sure you know the way
15 City Hall is laid out, her office was in the very back.
16 Q. Okay.
17 A. And back there was also the break room, and
18 that's where the City has a little sink and that's where
19 the refrigerator was and the coffeepot was. And when I
20 first started there Bobbie and I got along beautifully;
21 and shortly thereafter, it changed. And anytime I would
22 enter the break room Bobbie would let it be know that she
23 did not like my presence back there.
24 Q. How?
25 A. She'd slam her desk drawer, she'd throw

Page 38

1  pencils -- not throw them, she'd slam down, I should say.
2  She'd make noises. She'd shake her head. She'd roll her
3  eyes. She, on several occasions, called me bitch, which
4  I immediately reported to my supervisor at the time.
5  Well, first of all, it was to -- with Mr. Badeaux and
6  Pam Denny, and then it continued on for a couple of more
7  years and I reported it again to Paul Chavez.
8      She -- one time Yolanda opened the door and came
9  very close to hitting me with it/ They're very solid
10 doors. And she just said, Oh, I'm sorry, I almost hit
11 you with the door. And Bobbie was standing there at the
12 copier. And she said, Well, yeah, you didn't try hard
13 enough.
14     She would make comments on the phone. She --
15 you could tell she was having one conversation, but if I
16 walked back into the room she would make another -- the
17 whole conversation changed and she'd say something like,
18 You want to kill stupid people or hit stupid people.
19     I'd go back there and she'd say, Suey, suey,
20 suey. The day I moved from the City Hall to the Chamber
21 building she went around whistling, Happy days are here
22 again, that kind of stuff.
23 Q. Okay. And I'm not familiar with where the break
24 room is and where she sits. Were you within -- could you
25 see each other?

Page 39

1  A. Yeah.
2  Q. Was it in the same basic room?
3  A. Uh-huh.
4      MS. DANISH: Yes?
5      MR. NICOLAS: Yes?
6  A. Yes.
7  Q. (BY MS. LEEDS) That's okay, we'll tell you.
8      THE WITNESS: Can I have some water?
9      MS. DANISH: Yes.
10     MR. NICOLAS: I'll get it.
11 Q. (BY MS. LEEDS) What was the culmination of this
12 problem?
13 A. We -- the culmination, I believe, was the remark
14 about, Well, you didn't try hard enough. And I went and
15 told Paul, who was my supervisor, that that was it, I --
16 I had my fill and I wanted a meeting. I wanted this to
17 stop or I was going -- if it didn't get stopped I was
18 possibly considering further action.
19 Q. Okay.
20 A. And so we set a meeting for about an hour or
21 two later. We went into the City administrator's office
22 and sat down.
23 Q. Who's "we"?
24 A. Pam Denny, Paul Chavez, Bobbie La Gant, and I.
25 Q. And what happened?

Page 40

1  A. We had a meeting and in this meeting it was
2  brought forth that she had called me bitch on several
3  occasions, that every time I walked back there to get a
4  coke or get a cup of coffee she showed displeasure that I
5  was in the room. And Bobbie admitted in the meeting that
6  yes, she had called me bitch, and she told everybody she
7  just simply didn't like me. Wouldn't give any
8  explanation, if I remember, why.
9      And then if I remember correctly, all she got
10 was a written warning put in her personnel file. And I
11 think Pam said if it happened again then she'd get like a
12 three-day suspension.
13 Q. Did anything happen to you?
14 A. No.
15 Q. Okay. Is there anything else in your whistle
16 blower claim other than your report about Pam's misuse of
17 the credit card?
18     MS. DANISH: Objection; form.
19     THE WITNESS: What?
20     MS. DANISH: I said, Objection; form.
21 A. Yes.
22 Q. (BY MS. LEEDS) What?
23 A. Let's see, she also had her entire family on the
24 Sam's Club account.
25 Q. Okay. Is this something your report it?

Page 41

1    A. Yes.
2    Q. Okay. Go ahead.
3    A. She had her mother -- she had her family on
4  there. I don't remember who all that constitutes at this
5  exact moment, but everybody that was living was on --
6  that was her immediate family was on the account.
7    Q. Okay.
8    A. Repeat your question.
9    Q. What -- what else is part of your whistle blower
10  claim, aside from your reporting that Pam misused the
11  credit card?
12    A. And Sam's Club card.
13    Q. Okay.
14    A. And then years later there was the Home Program.
15    Q. The Home Program?
16    A. Uh-huh, I believe that's what it was called.
17    Q. Okay. Tell me about that.
18    A. This is the program that I was hired to help
19  with. The 1996 CDBGA, something like that, I don't --
20  Community Development. Anyway I was hired -- that's what
21  I was hired to help with with John Guevara. And with all
22  the many changes that took place it came to a head when
23  Alma Villarreal was hired as the community development
24  director. And Alma was getting some calls for certain
25  documents and they could not be produced. She was new to

Page 42

1  the job and she, of course, didn't know how every thing
2  worked. She'd only been on the job just a matter of
3  weeks.
4        And so, finally, one of the requirements of the
5  job is to go out and visually inspect the property. And
6  we went and inspected the property and there were some
7  discrepancies.
8    Q. Go ahead, you still haven't told me what you
9  reported.
10    A. There was -- I don't remember the address but --
11    Q. No, no, no. I'm talking about, you know, for
12  the whistle blower claim. You have to have made a
13  report, what was it, the report that you made?
14    A. That's what I'm telling you.
15    Q. Okay, go ahead.
16    A. And so we got in the car and we went looking,
17  and at two locations where there was supposed to be a
18  house there was no house.
19    Q. Okay. Is that it?
20    A. And so I was with Alma, she was the community
21  development director. After that, I believe -- I don't
22  know who Alma reported it to.
23    Q. What is it that you reported?
24    A. I do remember telling -- after this discovery,
25  the mayor at the time, we had discovered a piece of

Page 43

1  property where there was no house but there was supposed
2  to be a house.
3    Q. Okay. So your whistle blower claim entails your
4  reporting Pam Denny's misuse of the credit card and the
5  purchase of the radar?
6    A. Uh-huh.
7    Q. Say yes.
8      MS. DANISH: Yes?
9    A. Yes. I'm sorry.
10    Q. (BY MS. LEEDS) The reporting of her family
11  being on the Sam's Club account?
12    A. Yes.
13    Q. That was the City's Sam's Club card account,
14  right?
15    A. The City's Sam's Club, uh-huh, yes.
16    Q. And then your report to the mayor of two
17  locations where there was supposed to be houses when
18  there were no houses?
19    A. Correct.
20    Q. Is there anything else that makes up your
21  whistle blower claim?
22      MS. DANISH: Objection; form.
23    A. Yes.
24    Q. (BY MS. LEEDS) What?
25    A. I was asked to falsify documents.

Page 44

1    Q. Okay. Tell me about that.
2    A. It was during a -- I was working late one night
3  with -- I don't remember the exact individuals, but I
4  believe it was Candy Medina and Rosie Perez. And
5  Candy had asked that I work late and we were working on
6  accounts payable or whatever because Candy was now the
7  finance director and had taken over a whole lot of
8  things. And the City Council was in session, they went
9  downstairs to go into Executive Session. And they
10  called Pam in first into Executive Session and then I was
11  the next -- then Pam came out and told me, she said,
12  Paula, they're going to call you in in just a minute,
13  and I said, Oh, okay. And sure enough, they did and I
14  went into the Executive Session.
15    Q. Okay.
16    A. During this meeting it was about the Home
17  Program. This was when the City found out they were in
18  a lot of trouble. And they asked me if I knew about some
19  certain documents, and I said I knew of some of the
20  certain documents. And it was expressed to me to find
21  these documents, and I said that I could if they would
22  bring me the file boxes over from the warehouse over
23  there at the water plant. And I was then told to find
24  these documents.
25    Q. You were then told to find the documents?

Case 1:03-cv-00056   Document 44-5   Filed in TXSD on 03/29/2005   Page 14 of 22

## Page 45

1  A. Uh-huh. And I said that -- they were time
2  sheets, and they were wanting time sheets on anybody that
3  had worked on the Home Program. And I told them, I'm the
4  only one that has a time sheet. And they wanted -- they
5  asked if Pam Denny or Paul Chavez or anybody that had
6  worked on the program had time sheets. I said, No, I'm
7  the only one.
8      And they told me -- as I got up to leave, one of
9  the council members looked me in the face and said, You
10  need to find these documents, and I said, Okay. He said,
11  No, we need you to find these documents.
12  Q. Who told you to falsify the document?
13  A. At that time, Gonzalo Acevedo.
14  Q. What did he say to you?
15  A. We need you to find these documents.
16  Q. And you interpreted that as being, Falsify these
17  documents?
18  A. Yes.
19  Q. His words to you were, You need to find these,
20  but you understood that to mean, You need to falsify
21  these --
22  A. I had already told them they were not to even be
23  found, you couldn't find them.
24  Q. Okay. My question was, he told you, Find these
25  documents, and you understood that to mean, Falsify these

## Page 46

1  documents?
2  A. Correct. And then a day or two later, I was
3  sitting in Alma Villarreal's office and Tom Andrews walks
4  in, who was the City attorney, I believe, at the time.
5  And I told Tom, I said, I am not comfortable with
6  creating these documents. And he said, You're not
7  creating them, you're recreating them.
8  Q. Had these persons worked in the Home Program?
9  A. Had what persons?
10  Q. The persons whose time sheets you were being
11  asked to find?
12  A. Yes.
13  Q. Okay. What are these time sheets for?
14  A. As I understand it, the way Paul Chavez
15  explained it to me, when you have the Home Program,
16  of course, the state wants documentation that, you know,
17  from 8:00 to 2:00 you worked on their program, what did
18  you do: you filed, you book-keep, you did whatever. And
19  they were simply looking for the documentation showing
20  the people's time sheets that worked on this.
21  Q. Okay. Why -- why aren't these time sheets in
22  the file?
23  A. Pam Denny and Paul Chavez, at this time, did not
24  keep time sheets. I don't know -- I don't know how that
25  worked. They were salaried; and therefore, they didn't

## Page 47

1  have to keep a time sheet. People like Yolanda, Sarah
2  and I kept time sheets.
3  Q. Okay. So the persons on whom you were supposed
4  to find time sheets were only Pam Denny and Paul Chavez?
5  A. Yes.
6  Q. Did you ever go to them and asked them if they
7  ever had time sheets?
8  A. No, because they had never kept time sheets for
9  the City of Los Fresnos and those were the only time
10  sheets they were looking for.
11  Q. Okay. Do you know if they understood they
12  were supposed to keep time sheets if they worked on the
13  Home Program?
14  A. I don't know if they knew that or not.
15  Q. Okay. But you never asked them, Do you have a
16  time sheet for the Home Program?
17  A. The time sheet I'm talking about was -- it's not
18  a time sheet for the Home Program; it was a time sheet
19  that they were suppose to keep for the City. Am I making
20  sense? Do you follow?
21  Q. Yeah. No, I understand, but it's the time they
22  worked on the Home Program? The time sheet was to write
23  down the time that they spent working on the Home
24  Program?
25  A. Repeat that.

## Page 48

1  Q. Okay. What was the purpose of the time sheets?
2  A. The time sheets were to show documentation of
3  people who worked on the Home Program.
4  Q. Right. So the time sheets that you were asked
5  or that you had been asked to find were documents from
6  Pam and from Paul that would have shown how much time
7  they worked on the Home Program?
8  A. Correct.
9  Q. Okay. They didn't have to keep time sheets
10  about other stuff they did, but they were supposed to
11  keep time sheets when they worked on the Home Program?
12  A. I think I'm confusing this with you.
13  Q. Well, let me just ask you, were Paul and Pam
14  supposed to keep time sheets?
15  A. I have -- not for the City of Los Fresnos.
16  Q. Well, for the -- for -- fot anything. I mean,
17  you were asked to find the time sheets --
18  A. Right.
19  Q. -- on Pam and Paul?
20  A. Right.
21  Q. Why would they have had time sheets?
22  A. They wouldn't have time sheets.
23  Q. Did they work on the Home Program?
24  A. Yes.
25  Q. Is everybody that works on the Home Program

Page 49

1  supposed to keep a time sheet?
2     A. I was the only one that kept time sheets in the
3  City.
4     Q. That wasn't my question. Is everybody that
5  works on a Home Program supposed to keep a time sheet?
6     A. I don't know.
7     Q. Who else worked on Home Program?
8     A. Did the course -- the whole time I was there?
9     Q. Whoever would have a time sheet. Who else would
10 have a time sheet?
11    A. It would be -- if they -- that would be Alma
12 Villarreal; that would be Candy Medina; that would be Paul;
13 Darla Honea; that would be John Guevara.
14    Q. Okay. Some of these people had other jobs,
15 right, or they only worked on the Home Program?
16    A. Pam and Paul did not work specifically only on
17 the Home Program.
18    Q. I understand that.
19    A. Right.
20    Q. Okay.
21    A. I mean Paul did, Pam didn't.
22    Q. But the whole purpose of the time sheet is so
23 the government can see how much time each person has put
24 into the program, right?
25    A. Right.

Page 50

1     Q. Okay. So why wouldn't Paul and Pam have had to
2  keep time sheets when they worked on the Home Program --
3        MS. DANISH: Objection; form.
4     Q. (BY MS. LEEDS) -- if everybody else did?
5        MS. DANISH: If you know.
6     A. I don't know how to answer this question.
7     Q. (BY MS. LEEDS) Well, maybe you don't know.
8  I'm asking you why they would not have had to keep time
9  sheets if everybody else had.
10    A. I don't know why they would not have had to keep
11 time sheets.
12    Q. Okay. Now, where did these time sheets go?
13 Where are they kept?
14    A. At that time, I believe, over in the water
15 plant.
16    Q. In file cabinets?
17    A. I don't know, I was not responsible for that.
18 At the end of the year we -- I remember, you know,
19 removing all the old files. I mean, you know, Pam and
20 I and anybody who could work on it would just put it in
21 those -- those boxes that you get from Home -- Office
22 Depot.
23    Q. Yeah.
24    A. From there I didn't know what they did with
25 them.

Page 51

1     Q. Okay. Did you ever go back into those boxes and
2  see if there were any time sheets from Pam and Paul?
3     A. I had the boxes brought over from wherever they
4  were kept, and yes, I did go back.
5     Q. You went through every one of them?
6     A. Uh-huh.
7        MS. DANISH: Yes?
8     A. Yes.
9     Q. (BY MS. LEEDS) And I guess your answer is you
10 didn't find any time sheets for Pam and Paul?
11    A. Correct.
12    Q. And Paul Chavez had what position at this time?
13    A. Well, he was already gone, but he was the
14 community development director.
15    Q. Okay. So when they asked you to find these time
16 sheets on Paul --
17    A. I believe the grant had already closed out, and
18 so they were wanting the people that were there during
19 the time of the grant.
20    Q. Okay. Who was the community development
21 director after Paul?
22    A. Alma Villarreal.
23    Q. Okay. Was she keeping time sheets?
24    A. I don't know.
25    Q. Was she there during the time that the Home

Page 52

1  Program was still viable?
2     A. No, I believe it had already closed out.
3     Q. Do you know what the results -- the City got
4  into a little bit of trouble because of that program,
5  right?
6     A. Yes.
7     Q. Financial trouble?
8     A. Yes.
9     Q. Do you know what the results of that was?
10    A. I believe the City was supposed to pay back some
11 money --
12    Q. Do you know --
13    A. -- to the state.
14    Q. Do you know if they did?
15    A. I have no clue.
16    Q. Do you know how much it was?
17    A. I want to say 500,000, but I'm not sure if that
18 is the exact dollar amount.
19    Q. So you're really just guessing?
20    A. At that point, yeah.
21    Q. Is there anything else that makes up part of
22 your whistle blower claim?
23    A. No.
24    Q. So we got four things, right?
25    A. Uh-huh.

---

Page 53

1    Q. We have Pam -- yes?
2    A. Yes.
3    Q. We have Pam Denny's misuse of the credit card?
4    A. Uh-huh, yes.
5    Q. We have her family on Sam's Club?
6    A. Yes.
7    Q. We have no house where there should have been?
8    A. Yes.
9    Q. And we have the City Council asking you to find
10   some documents and you believe they were telling you to
11   falsify those?
12   A. Yes.
13   Q. Okay. Anything else that is part of your
14   whistle blower claim?
15   A. Not that I recall.
16   Q. Okay. Sam's Club: Who did you report that to?
17   A. Paul Chavez, Ruth Hernandez, Manuel Abrego,
18   Ida Garcia.
19       MS. DANISH: We've been going about an
20   hour. Can we take a break?
21       MS. LEEDS: Yes.
22       THE REPORTER: Off record.
23       (Off the record at 3:10 p.m.)
24       (On the record at 3:20)
25   Q. (BY MS. LEEDS) Okay. I think we were kind of

---

Page 54

1    sort of finishing up on your whistle blower claim. And
2    just so, we'll start there. Is there anything else you
3    can think of that is part of your whistle blower claim
4    that you have not mentioned so far?
5    A. Not that I can think of right now.
6    Q. Okay. You also have a claim for defamation?
7    A. Yes.
8    Q. Right?
9    A. Yes.
10   Q. And you understand that to be slander?
11   A. Right.
12   Q. Right? What is your understanding of what that
13   claim entails?
14       MS. DANISH: Objection; form.
15   A. What do I understand slander?
16   Q. (BY MS. LEEDS) Yes.
17   A. The slander claim?
18   Q. Well, let me just put it this way: There's
19   slander and there's libel. Libel is when it's written.
20   A. Oh, okay.
21   Q. Okay. And slander is when somebody said
22   something.
23   A. Okay.
24   Q. So what do you understand was said?
25   A. I understand that it was said to Johnny Cavazos

---

Page 55

1    by Tom Andrews that they needed to find something on me.
2    And he went to Johnny Cavazos, and as I understood what
3    was being said that Tom said, We need to find something
4    on Paula. And Johnny said, No, and asked Tom to leave
5    the office -- to leave his office. He's at Johnny's
6    office.
7    Q. Okay. How did you learn of this conversation?
8    A. I was told about this conversation some time
9    later by Johnny Cavazos.
10   Q. Was he still employed with the City when he told
11   you?
12   A. Yes.
13   Q. Do you know what state of status -- whoops --
14   where his position was with the City at the time he told
15   you?
16   A. He was not in the best of terms. Though it --
17   it wasn't at rocky as it was towards the end.
18   Q. Okay. Did he already know at that point that he
19   thought they were going to try to terminate him?
20       MS. DANISH: Objection; form.
21   A. No.
22   Q. (BY MS. LEEDS) Or, I mean, did he express
23   anything like that to you or did you know from other
24   sources that he was in that situation?
25   A. I don't recall.

---

Page 56

1    Q. Okay. So the exact timing of when he told
2    you're not sure if you can pinpoint it as far as what was
3    going on with Johnny at the time?
4    A. Uh-huh.
5        MS. DANISH: Objection; form.
6    Q. (BY MS. LEEDS) Correct?
7    A. Say that again.
8    Q. Yeah, if you look at the time line of Johnny's
9    employment, you aren't sure where in that time line it
10   was that he told you through out this conversation?
11   A. Correct.
12   Q. Do you remember what year it was?
13   A. No. Well, I was terminated in 2001 it was that
14   year.
15       MS. DANISH: --'02.
16   A. 2002, I'm sorry, see.
17   Q. (BY MS. LEEDS) February 2002, okay.
18   A. It was in 2002.
19   Q. So he told you this in 2002?
20   A. Yes.
21   Q. All right. Who told you? Johnny told you.
22   Where did he tell you?
23   A. At the senior citizen center.
24   Q. Did he tell you as if it were a report, or did
25   he tell you, Hey, Paula, I've got to tell you something.

---

Page 57

1   A. No, he told me as a report.
2   Q. That you better watch out?
3   A. That this had been done and said.
4   Q. Is there anything -- and you are just suing
5 Tom Andrews for slander, correct?
6      MS. DANISH: Objection; form.
7   A. Correct.
8   Q. (BY MS. LEEDS) Is there any --
9   A. I don't remember -- I don't recall right now,
10 at this time.
11   Q. Well, let me ask you this: Is there anybody
12 else from the City that you think has slandered you?
13   A. I was told that -- I can't recall the lady's
14 name, she's a hairdresser, but she had reported to me
15 some things that Yolanda Perez had said about me. But I
16 don't remember her name.
17   Q. You don't remember who told you?
18   A. I remember who told me, I just can't think of
19 her name at the moment.
20   Q. It's the hairdresser that told you?
21   A. Right.
22   Q. All right. What did she say Yolanda said?
23   A. Something about my stealing money from the City
24 and that "I just wasn't doing an overall good job" kind
25 of a comment. There were other people there at the time.

Page 58

1 So she didn't elaborate what was -- because there was too
2 many ears to hear.
3   Q. Okay. So this was in her salon?
4   A. Uh-huh.
5      MS. DANISH: Yes?
6   A. Yes.
7   Q. (BY MS. LEEDS) Do you know where it was that
8 Yolanda told her this?
9   A. She told me Yolanda told her in the salon.
10   Q. All right. You know if anybody overheard?
11   A. I don't know.
12   Q. But the hairdresser didn't tell you, Oh, by the
13 way, you know, "fue la" -- do you know Spanish?
14   A. No, I don't.
15   Q. I've got to redirect my mind here. The
16 hairdresser didn't tell you that there was other
17 people --
18      MS. LEEDS: Strike that.
19   Q. (BY MS. LEEDS) The hairdresser did not tell you
20 who else might have been in her shop, the day Yolanda
21 told her this, that would have heard this that you could
22 verify it with?
23   A. Correct.
24   Q. All right. Stop and think it would be a lot
25 easier. Okay, do you remember when this happened?

Page 59

1   A. This was after my termination, but exact date,
2 no.
3   Q. Did she give you any indication of when Yolanda
4 told her this?
5   A. It was after my termination.
6   Q. Okay. Do you -- well, you said there were
7 other -- well, were there men there?
8   A. I don't know.
9   Q. Okay. But other clients of hers?
10   A. Other clients.
11   Q. Were there other clients of hers there when you
12 were there when she told you?
13   A. I don't know who the clients were.
14   Q. No, no, not who they were. But they were her
15 clients?
16   A. Yes.
17   Q. All right. Were there other men there -- or
18 were there men there?
19   A. I don't think so.
20   Q. Okay. Has anybody indicated to you that they
21 overheard the hairdresser telling you this?
22   A. I don't recall.
23   Q. Okay. So obviously, it's a hairdresser that
24 both you and Yolanda go to?
25   A. She uses one lady; I use another.

Page 60

1   Q. But the same place?
2   A. Same place.
3   Q. See, a little bit of deduction. Okay.
4 Anybody else that you think has slandered you?
5   A. Not that I can recall right now.
6   Q. Okay. Well, it's about -- okay. Have you been
7 to any doctors or healthcare professionals about any of
8 the damages that these issues of which we have spoken
9 about have affected you?
10   A. Yes.
11   Q. Who?
12   A. While I was with the City of Los Fresnos I
13 was Dr. Stephanie Garcia. She was my primary physician
14 at the time. And I'm trying to think if there was
15 anybody -- because I quit using Stephanie because she
16 moved primarily to the Island and it was an inconvenience
17 to still use her. So I'm just trying to think if there
18 is anybody in between Stephanie and Dr. -- my current
19 physician is Dr. Nancy Rickerhauser. Nancy Rickerhauser.
20   Q. Do you want to spell that?
21   A. R-i-c-k-e-r-h-a-u-s-e-r.
22   Q. Where is she?
23   A. She is with Valley Baptist Hospital. It's the
24 Family Residency Program.
25   Q. So she's a resident?

**PAULA REYNOLDS** CondenseIt™ 10/20/04

Page 61

1  A. No, she's a full-fledged -- that's just what
2  it's called. That's what the complex is called.
3  Q. Okay.
4  A. She's a full-fledged doctor.
5  Q. Is she an internist; do you know?
6  A. I think she is a GP. She does a little bit of
7  it all.
8  Q. What kind of doctor was Dr. Garcia?
9  A. She was a GP.
10  Q. Okay. What kinds of things would you go to
11  Dr. Garcia for? She was on the Island, right?
12  A. No, this was before she moved to the Island.
13  She was over there also by Valley Baptist.
14  Q. And then Dr. Garcia moved to the Island?
15  A. Yes.
16  Q. That's when you stopped going to her?
17  A. Right.
18  Q. Okay, gotcha.
19  A. What did I go to her for?
20  Q. Yeah, was she your family doctor?
21  A. She was everybody's doctor in the family,
22  correct.
23  Q. Okay.
24  A. And I went to her for every thing.
25  Q. What about Dr. Rickerhauser?

Page 62

1  A. She's also everybody's doctor.
2  Q. Your family doctor?
3  A. Family doctor, there you go.
4  Q. Have you received any specific mental health
5  treatment?
6  A. I guess if you call it treatment, I was taking
7  from Stephanie at the time, Prozac.
8  Q. For how long?
9  A. Gosh, five years or so.
10  Q. When did you stop?
11  A. I quit Prozac -- it's been a long time.
12  I don't even recall when I quit Prozac, it's been
13  a while.
14  Q. Before Dr. Garcia went to the Island?
15  A. No, no I was still on it then.
16  Q. Okay. Did you get any prescriptions for Prozac
17  under Dr. Rickerhauser?
18  A. Yes, some. And then she switched me over to
19  something else.
20  Q. An antidepressant -- another antidepressant?
21  A. Yeah, I want to say Xanax, but that's not the
22  one.
23  Q. Are you on one now?
24  A. No.
25  Q. Since when have you not taken any kind of

Page 63

1  antidepressant?
2  A. Oh gosh, I don't recall it's been a long time.
3  Q. Since before your termination?
4  A. Oh, no, I was on it during my termination.
5  Q. Were you going to see Dr. Rickerhauser during
6  that period of time?
7  A. No.
8  Q. Dr. Garcia?
9  A. Dr. Garcia.
10  Q. Okay. Let me just get these time lines straight
11  here.
12  A. The whole time I was with the City of
13  Los Fresnos it was Dr. Garcia.
14  Q. And how long after your termination were you
15  still with Dr. Garcia?
16  A. I think it was kind -- I'll say I don't recall,
17  but maybe a month because it was some where in there that
18  she moved to the Island.
19  Q. About the same time --
20  A. Yeah.
21  Q. -- that you were terminated?
22  A. Uh-huh.
23     MS. DANISH: Yes?
24  A. Yes.
25     MS. DANISH: That was me.

Page 64

1     THE WITNESS: I'm sorry.
2  Q. (BY MS. LEEDS) Okay. So we can -- and you were
3  without a job, you said, about four months?
4  A. About four months.
5  Q. So we can say that -- were you still on the
6  antidepressant when you started working at RAC?
7  A. Yes.
8  Q. So you've been off the antidepressant less than
9  two-and-a-half years?
10  A. I was on it for some time while I was still at
11  the RAC, but yeah, it's been a while.
12  Q. Okay.
13  A. Yeah.
14  Q. But I'm saying that because you've been at the
15  RAC for about two-and-a-half years --
16  A. Uh-huh.
17  Q. -- and you were on it for a portion of that
18  time?
19  A. Uh-huh.
20  Q. So it's been less than two-and-a-half years that
21  you have been off it?
22  A. Correct.
23  Q. Okay.
24  A. Off the Prozac.
25  Q. Off the one that Rickerhauser gave you?

**PAULA REYNOLDS**   CondenseIt™   10/20/04

Page 65

1    A. Right.
2    Q. You said she gave you something like Xanax or
3 something.
4    A. Yeah, right.
5    Q. And you're not taking anything?
6    A. Not right now.
7    Q. Are you taking any other kind of medication
8 other than vitamins?
9    A. No, Imitrex if I have a migraine. I take -- I
10 have what they call restless-leg syndrome.
11    Q. Yes.
12    A. And I take Darvon one a day. That's the only
13 thing I found that helps.
14    Q. My sister found that aspirin -- two aspirin
15 works. I tried it, but it doesn't work.
16    A. You have it?
17    Q. Yeah. Anything else? Do you take vitamins?
18    A. No.
19    Q. Shame on you. Have you seen any other doctors
20 besides Dr. Garcia and Dr. Rickerhauser?
21        MS. DANISH: Related to this lawsuit?
22        MS. LEEDS: No.
23        MS. DANISH: Just in general?
24        MS. LEEDS: In general.
25    A. In general?

Page 66

1    Q. (BY MS. LEEDS) Yep.
2    A. Yes, I have seen -- its Bien Star -- B-i-e-n
3 Star in Brownsville. It's Randy Thompson.
4    Q. For what?
5    A. Just counseling, in general.
6    Q. Well, when you say "in general," you usually go
7 because there is a problem?
8    A. Correct.
9    Q. What was the problem that led you there?
10    A. Los Fresnos.
11    Q. Okay. Any thing else?
12    A. I was having some marital problems next.
13    Q. Okay. Are you still going to see -- he's --
14 what is he, Ph.D.?
15    A. I don't know.
16    Q. Okay.
17    A. I don't know.
18    Q. Are you still seeing him?
19    A. No.
20    Q. How long did you see him?
21    A. I don't recall, but I -- a broad guess, a couple
22 of years, three years.
23    Q. While you were employed at Los Fresnos?
24    A. Yes.
25    Q. Did you continue seeing him during your

Page 67

1 termination?
2    A. Yes.
3    Q. Peritermination?
4    A. I believe so, if I could afford the fee I did.
5    Q. Okay. Any other doctors or healthcare
6 professionals?
7    A. I just recently started seeing -- I cannot for
8 the life of me think of her name. She's on the
9 expressway by the New Hampshire exit. I'm sorry, I've
10 drawn a total blank.
11    Q. On the expressway by the New Hampshire exit,
12 which side of the highway?
13    A. In Harlingen, heading towards the mall.
14    Q. On the expressway?
15    A. Uh-huh.
16    Q. Good Samaritan Center?
17    A. It's the old KTX, the old radio station.
18    Q. Oh, yeah.
19    A. Right in there.
20    Q. Okay.
21    A. I cannot -- I'm drawing a total blank.
22    Q. What do you see her for? You know, it's a
23 woman, right?
24    A. Yes, it is a woman. Just general counseling.
25    Q. And I've got to ask the same question with the

Page 68

1 "general." What's --
2    A. Just --
3    Q. What led you to her?
4    A. Marital problems.
5    Q. And are you still seeing her?
6    A. Yes.
7    Q. Is your husband seeing any counselor?
8    A. Not to my knowledge.
9    Q. Did you ever go to marital counseling together?
10    A. We had used our pastor at the church, but he is
11 no longer here.
12    Q. Okay. How long have you been separated?
13    A. We have been separated -- I want to say since
14 May -- not this May but the May before.
15    Q. 2003?
16    A. Yes.
17    Q. Okay. The other claim you have is based on the
18 First Amendment, correct?
19    A. Correct.
20    Q. Tell me about what you believe has occurred
21 where somebody violated your First Amendment rights.
22        MS. DANISH: Objection; form.
23    A. I was not able to confront the City Council.
24 I -- we had put in for, I don't recall, one or two --
25 you're supposed to get a hearing if you're terminated.

Page 69

1  You -- you have the right to a hearing, and I was never
2  able to do that. I -- I believe it had been posted,
3  but I want to say for some reason it got cancelled or
4  something.
5      Q. Okay. You had requested one -- this is after
6  your termination?
7      A. This is after my termination.
8      Q. You requested a hearing?
9      A. Uh-huh.
10     Q. And -- "Uh-huh," yes?
11     A. Yes.
12     Q. But did not get one?
13     A. Correct.
14     Q. Is there anything else that you believe supports
15  a violation of your First Amendment rights?
16     A. I can't recall right now.
17     Q. What do you understand your First Amendment
18  right to be?
19         MS. DANISH: Objection; form.
20     A. Tell me what the First Amendment is.
21     Q. (BY MS. LEEDS) Your right to free speech;
22  free association to, you know, belong to any political
23  party or affiliation --
24     A. Okay, now repeat your question.
25     Q. -- religion -- freedom of religion is the First

Page 70

1  Amendment. What do you believe that means to you in
2  terms of what happens to you in your daily life? What
3  do you interpret that freedom to allow you to do?
4         MS. DANISH: Objection; form.
5      A. What do I believe the First Amendment allows me
6  to do in my daily life?
7      Q. (BY MS. LEEDS) Uh-huh.
8      A. Since the termination?
9      Q. No, just in general.
10     A. In general.
11     Q. You're suing the City for that and I'm just
12  trying to understand what you think that means.
13     A. Just the things you said. Freedom of religion,
14  freedom of speech.
15     Q. Okay. And what I want to do is relate that to,
16  you know, in your mind you believe the City has violated
17  those freedoms?
18     A. Correct.
19     Q. Okay. And as you sit here today, is there
20  anything else about your claims against the City, be it
21  First Amendment, whistle blower, or defamation, and
22  infliction of emotional distress? Anything else that you
23  can think of that the City did to you that you have not
24  mentioned so far? And what I mean by the City is anybody
25  else.

Page 71

1      A. I do know that there was -- there were times
2  that Pam was supposed -- she was the supervisor of Sarah
3  and Yolanda -- she -- and Bobbie. She did not -- even
4  though she was made aware of the problem with Bobbie
5  calling me a bitch and the ongoing daily stuff with
6  Bobbie -- daily stuff -- hourly stuff with Bobbie,
7  she did nothing to really stop it. She allowed it to
8  continue day after day after day. And when there would
9  be squabbles there was no supervision, as I've
10  experienced in other places where the boss sits down
11  and you say -- you work it out so everybody can come to
12  work and have a peaceful environment.
13     Q. Okay. Anything else?
14     A. Repeat your question again.
15     Q. Anything that anybody in the City did to you we
16  haven't mentioned so far that you believe, as far as your
17  First Amendment, whistle blower, defamation, or your
18  infliction of distress claim?
19     A. I was -- no, not that we haven't mentioned.
20     Q. Okay. We've mentioned a lot of stuff here.
21     A. A lot of stuff, right.
22     Q. So I'm trying to get out everything that
23  you're -- you know, if we have to go to trial that you
24  won't think of something new that the City did that we
25  haven't talked about.

Page 72

1      A. The pressure put on me to find the documents
2  that didn't exist.
3      Q. Okay.
4      A. The -- just the general -- just the general
5  feeling of working there, it was just a very dreaded
6  place to go.
7      Q. And you worked there from '96, right?
8      A. Correct.
9      Q. Since '96, okay. Talking about those documents
10  for a moment, who was in charge of the documents?
11     A. I don't recall.
12     Q. Was that part of the CDC office, those
13  documents?
14     A. Those documents were part of the CDC office.
15     Q. What do you know about any investigation that
16  was done on those?
17     A. On the -- the documents I was looked for?
18     Q. No, on any --
19     A. On the whole?
20     Q. -- on -- yeah.
21     A. I just know that the state had come down and
22  investigated, I know, that particular program and maybe
23  another one, but I -- I don't recall.
24     Q. Because I'm trying to get at who was asking for
25  these time sheets. I mean, the City Council was asking

Page 73

1  for them because somebody asked them for them, right?
2    A. I'm assuming the state was asking from the --
3  asking the City Council to produce these things; I have
4  no actual knowledge.
5    Q. Okay. Were there any documents kept in
6  City Hall regarding the Home Program?
7    A. All the files regarding the Home Program were to
8  have been kept in City Hall.
9    Q. And why were they in the --
10   A. Those are -- well, at the end of the year you
11 would change over.
12   Q. Oh, okay.
13   A. But, I mean --
14   Q. The current ones --
15   A. The current ones.
16   Q. -- were at City Hall?
17   A. Right, the current year's.
18   Q. Do you know anything -- anything about those
19 documents being moved out of City Hall?
20   A. I have no -- none -- no.
21   Q. Do you know anything about Mr. Cavazos taking
22 those files?
23   A. Johnny Cavazos?
24   Q. Johnny.
25   A. No, no, I don't.

Page 74

1    Q. Did he ever talk to you about the Home Program?
2    A. No.
3    Q. Did he ever tell you anything about any
4  investigation that was going on with the Home Program?
5    A. No.
6    Q. And of the current files, who -- other than
7  Alma -- so if I understand you correctly, the only
8  persons whose time sheets were missing is -- is
9  those -- excuse me. Were those the only documents that
10 you knew of that the state said were missing?
11      MS. DANISH: Objection; form.
12   A. I don't know if that's the only documents that
13 the state said was missing.
14   Q. (BY MS. LEEDS)  But that's all that was brought
15 to your attention?
16   A. That's all that was brought to my attention.
17      MS. DANISH: Objection; form.
18   Q. (BY MS. LEEDS)  Oh, okay. So if the state said
19 there were a bunch of documents missing you wouldn't know
20 about that.
21   A. I wouldn't know about that.
22      MS. LEEDS: If we can have five minutes.
23      MS. DANISH: You bet.
24      (Off the record at 3:45 p.m.)
25      (On the record at 3:53 p.m.)

Page 75

1       THE REPORTER: Back on record.
2    Q. (BY MS. LEEDS)  Ms. Reynolds, how much money are
3  you currently making?
4    A. I believe about 21,000.
5    Q. Have you gotten a raise since you started with
6  RAC?
7    A. A very small one. The state hasn't given any
8  raises lately. A very small one initially right after,
9  like, my six month review.
10   Q. You are technically a state employee, correct?
11   A. Correct.
12   Q. Were you able to transfer any benefits that you
13 had with the City to your state employment?
14   A. I could have, but I did not.
15   Q. Just two more follow-up questions regarding
16 the Home Program. I had asked you if Mr. Cavazos had
17 ever talked to you about it in any manner regarding any
18 investigation. Do you know of any investigation, federal
19 or state or any kind, that is on going regarding the
20 City of Los Fresnos and the Home Program?
21   A. I have no clue.
22   Q. Okay.
23   A. I -- I don't know if that is completely over or
24 if it's still on going. I don't know.
25   Q. So no investigator, federal or state, has ever

Page 76

1  contacted you about that program?
2    A. Not that I recall.
3    Q. Okay. Thank you.
4       MR. NICOLAS: We'll reserve our questions
5  until the time of trial.
6       (The proceedings concluded at 3:50 p.m.)
7
8       -o0o-
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

PAULA REYNOLDS                    CondenseIt™                          10/20/04

Page 77

REPORTER'S CERTIFICATION

I, SUSAN POCKRUS, a Certified Shorthand Reporter in

and for the State of Texas, do hereby certify that the

facts stated by me in the caption hereto are true; that

the foregoing deposition transcript of PAULA REYNOLDS,

the witness hereinbefore named, was at the time mentioned
taken by me in stenograph, the said witness having been
by me first duly cautioned and sworn upon her oath to
tell the truth, the whole truth, and nothing but the
truth, and later transcribed from stenograph.

I further certify that I am neither attorney or
counsel for, nor related to or employed by any of the
parties to the action in which this deposition is taken,
and further certify that I am not a relative or employee
of any attorney or counsel employed by the parties
hereto, or financially interested in the action.

I further certify that the above and foregoing
deposition transcript as set forth in typewriting is a
full, true and correct transcript of the proceedings had
at the time of taking said deposition.

Page 79

CHANGES AND SIGNATURE

PAGE   LINE   CHANGE      REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

PAULA REYNOLDS

Page 78

Certified to by me this the 10th day of November,

2004.

_____

SUSAN POCKRUS

CERTIFIED SHORTHAND REPORTER
STATE OF TEXAS
CERT. NO.: 5862   EXP. DATE: 12/31/05

POCKRUS REPORTING SERVICE  FIRM NO. 419
P.O. BOX 531786
HARLINGEN, TEXAS 78553
1-800-423-7713
1-800-423-7730

Page 80

I, PAULA REYNOLDS, have read the foregoing

deposition and hereby affix my signature that same is

true and correct, except as noted above.

_____

PAULA REYNOLDS

THE STATE OF _____ )
COUNTY OF _____ )
    Before me, _____, on
this day personally appeared, PAULA REYNOLDS, known to me
(or proved to me under oath or through _____)
(description of identity card or other document) to be
the person whose name is subscribed to the foregoing
instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
expressed.
    Given under my hand and seal of office this
_____ day of _____, 2004.

_____

NOTARY PUBLIC IN AND FOR
THE STATE OF _____